**Robert L. WALSH, Plaintiff,**

v.

**CITY OF CHICAGO, Superintendent Fred Rice, Jr., Assistant Deputy Superintendent Leonard Zaleski, Lieutenant Robert T. Curry, Sergeant Robert Zdora, Sergeant Paul L. Tasch, Jr., Sergeant George Leslie, and Officer Patricia Kane, Individually and as officers of the Chicago Police Department of Defendant City of Chicago, Defendants.**

No. 87 C 3336.

United States District Court,
N.D. Illinois, E.D.

April 20, 1989.

John P. DeRose, John P. DeRose and Associates, Chicago, Ill., for plaintiff.

Maria C. Campo, Office of Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This motion for summary judgment under Rule 56, Fed.R.Civ.P., turns largely on one question: did a now-deceased Chicago police lieutenant violate the Constitution or laws of the United States during a 30–minute exchange with former Chicago police officer Robert L. Walsh? If he did, then a number of defendants here—Paul L. Tasch, Jr., Robert Zdora, Patricia Kane, Leonard Zaleski, Fred Rice, Jr., and the City of Chicago—will be liable to Walsh. If he did not, then they will suffer no penalty.

These are the undisputed facts: on August 27, 1985, Sgt. Robert Zdora of the Internal Affairs Division ("IAD") of the Chicago Police Department received a phone call from a person who identified himself as State's Attorney Barrett. Barrett told Zdora that he had a complaint regarding Officer Walsh. Barrett said that he told the complainant to contact IAD, and that Zdora should expect a call. It came later that day. The female voice on the end of the line told Zdora that Walsh and his wife were using and dealing drugs—an activity illegal for both persons, but also against several of Walsh's employment rules.

Having heard these serious allegations, Sgt. Zdora opened an investigation of Walsh, beginning with a surveillance of the Walsh home. IAD watched the Walsh house seventeen times between August 28 and October 23, 1985, noting the license plates of vehicles that came and went. IAD personnel observed nothing incriminating. Early in October 1985, Officer Patricia Kane joined Zdora on the Walsh investigation. The officers learned that Hannah Walsh, Officer Walsh's wife, performed

beauty services in her home. Zdora told Kane to arrange for a haircut with Hannah and determine if there was anything untoward occurring inside the Walsh home. Kane obtained Hannah's telephone number from Zdora, called her up, and made a hair appointment.

Kane arrived at the Walsh home for her haircut on October 12, 1985. She used the name of Terri Roberts. What Kane and Hannah said to one another is disputed, but Kane prepared an internal memorandum which reported that she had waited on the first floor of the Walsh residence while Hannah finished with another customer. Hannah then told Kane to dampen her hair in the kitchen sink, and offered Kane a beer. Kane declined. Hannah then directed Kane to the basement, and reportedly told the children who were playing in the house to be quiet while "Bob" was sleeping. Kane asked who was "Bob." Hannah replied that it was her husband, who was a police officer. Hannah then reportedly slurred her words, explained that she was hung over, then asked Kane, "You ever do coke?" Kane held up her hands and shrugged. Hannah then reportedly said, "Well, that's really what's wrong with me. I did a couple of lines last night and I'm still feeling it."

Kane inquired if her husband objected. Hannah reportedly laughed off this suggestion, and said that he used cocaine too. Hannah then reportedly asked Kane if she wanted to "do a line," which Kane refused. Kane later reported that she then observed Hannah ingest cocaine.

Shortly thereafter, Hannah offered to sell Kane some cocaine, and Kane agreed. Kane purchased $100 worth of the drug. A while later, Hannah reportedly asked Kane if she knew someone who could "take the rest of the stuff" off of her hands. Kane said she would check, and would arrange to meet with Hannah again. Later that day Kane relinquished the cocaine to Zdora, who had it weighed and tested.

Five days later Kane returned to the Walsh residence and purchased $50 more cocaine. On October 30, 1985, Kane telephoned Hannah about yet another cocaine purchase. According to a memo which Kane prepared subsequent to this conversation, Hannah said that Officer Walsh "uses, but does not tell a lot of people." Kane reported asking her if she had told her husband that Kane had purchased cocaine from her. Hannah said that she had, and that Officer Walsh had cautioned her not to see someone whom they did not know well. Walsh reportedly "was concerned because anybody could be working undercover." Kane reported further that Hannah said that Officer Walsh did not use as much cocaine as she did, but that he used it, mostly when "he had a few days off, so it would not be in his system and he would not get caught by a urine test when he got back to work."

On the afternoon of November 6, 1985, shortly after Officer Walsh left for work, Chicago Police apprehended Hannah pursuant to an arrest warrant at her home. Hannah left her three children, ages four to seven, with a neighbor before leaving with the police for the station. At approximately the same time Officer Walsh was checking his assignment for the afternoon shift at the 8th District Headquarters of the Chicago Police Department. Someone told him that he was wanted in the Watch Commander's office. Walsh went to the office, and there met Sgt. Paul L. Tasch, Jr., Sgt. George Leslie, and one other officer. All three were from IAD. Sgt. Leslie tendered to Walsh three forms. One stated the allegation that Walsh used and kept cocaine at his home, another advised Walsh of a right to counsel and notified him of a hearing date, and a third advised him of his administrative rights. Walsh acknowledged receipt of each of the forms by signing them. Walsh then claims that he asked to make a phone call, but that the officers refused his request. The officers asked Walsh no questions, other than whether he understood what he had signed.

Tasch and an unknown officer then took Walsh to the Department's Medical Section in order to obtain a urine specimen. Neither officer questioned Walsh about the allegations against him during the drive. After arriving at the Medical Section,

Walsh gave a specimen freely, then went into a small office. There he faced Lt. Robert Curry and Sgts. Tasch, Leslie, Mueller, and Conroy. According to Walsh, Curry said "you probably know what's going on by now." Walsh said that he didn't. Curry then informed him that Hannah was under arrest for narcotics and was being held in the lockup at 11th and State. Walsh asked where his children were. "Don't worry about your three sons," Curry replied. "We have got enough on you, but if you sign this resignation then we will tell you where your children are." Curry pushed a resignation form towards Walsh and insisted he sign it.

Walsh was upset. He was worried about what was happening to his wife at the lockup, and wondered if his children were in the custody of the Illinois Department of Children and Family Services ("DCFS"). No one had read Walsh the *Miranda* warnings. It is possible too—although this is a matter of dispute—that Curry threatened Walsh with criminal prosecution and loss of pension benefits. On the other hand, the IAD officers never interrogated Walsh about his alleged cocaine use or drug dealing. They left him with a choice, which in Walsh's mind was no choice. Walsh resigned.

Two days later Walsh regretted what he had done and sought to withdraw his resignation. The Department refused his request. Walsh heard from his former colleagues that a Lt. Burns had told officers during a roll call at the 8th District that Walsh was dealing dope and that everyone should watch himself. He also heard that a Commander Corless had remarked to a group of officers who were selling raffle tickets that "I hope they're not for that dope dealer, Walsh." Walsh understood that the word around the District was that Walsh was a "big dope dealer." Walsh insists that this is false, and that apart from Kane and Zdora's reports, there is no evidence that he took or sold drugs. In fact, the urine specimen which the Depart-

ment obtained showed no traces of illicit substances.

Walsh subsequently filed suit in this court. Following a motion to dismiss, four counts of Walsh's original complaint are left. Count 1 is a claim under 42 U.S.C. § 1983 (1982) against Leslie, Curry, Tasch, Zdora, Kane, Leonard Zaleski, Fred Rice, Jr., and the City of Chicago for various violations of Walsh's constitutional rights. In Count 2 Walsh claims that a conspiracy to deprive him of his rights existed among these same persons. Count 5 is a claim of slander under Illinois law for the three station house comments, while Count 6 is a claim under Illinois law for breach of the contract between Walsh's union, the Fraternal Order of Police, Chicago Lodge Number 7, and the City of Chicago. All of the defendants have moved for summary judgment.

As stated at the outset, this case largely boils down to whether one man, Lt. Curry, acted wrongfully in seeking Walsh's resignation during his 30–minute meeting with Walsh at the Medical Section. Strangely enough, Lt. Curry should not be in this case any longer. The defendants filed a suggestion of Curry's death upon the record on June 21, 1988. Under Rule 25(a)(1), Fed.R.Civ.P., Walsh could have substituted Curry's representatives once Curry's death was known. Rule 25(a)(1) allows substitution, however, only within 90 days after a party suggests the death upon the record; Walsh has never moved for substitution, and thus according to Rule 25(a)(1) this court must dismiss this action as to Lt. Curry.[1]

Despite this, Lt. Curry played the most critical role in this dispute. At bottom, this case is about whether the Chicago Police Department unlawfully coerced Walsh to resign his position. Walsh argues that only one person overcame his will: Curry. Everyone else whom Walsh has sued may have aided or abetted Curry in this effort (or encouraged it, in the case of Rice and

---

1. The court also must dismiss Sgt. Leslie, as Walsh never served him. Walsh served what he believed was Leslie's employer, the City of Chicago, on April 29, 1987; it is undisputed, how-

ever, that Leslie retired from the force effective July 16, 1986. Dismissal is thus warranted. See Rule 4(j).

the City), but Walsh presents no evidence that the others personally coerced him into resigning.[2] This court will thus focus primarily on Curry's activities, as have the parties.

Walsh claims in his complaint and in his brief in opposition to the defendants' motion that Curry deprived him of his rights under the Sixth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments to the Constitution. When called upon to explain how, Walsh has limited his arguments to just three of these amendments: the Sixth, Ninth, and Fourteenth.

■ Walsh's Ninth Amendment claim betrays a misunderstanding of what that amendment provides. The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The language of the amendment reveals that it is a mere residual provision, adopted by Congress and the states to establish that the Constitution is not a complete and exclusive statement of a person's rights. While there are cases which suggest that the amendment is a source of protection against incursions on privacy, see, for example, *Griswold v. Connecticut*, 381 U.S. 479, 486–99, 85 S.Ct. 1678, 1682–90, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring) (Ninth Amendment, applicable to the states via the Fourteenth Amendment, provides substantive protections for "fundamental personal liberties"), none of these cases suggests that the Ninth Amendment protects a public employee's interest in his job. A court in this district has explicitly held that the Ninth Amendment provides no such protection, see *O'Donnell v. Village of Downers Grove*, 656 F.Supp. 562 (N.D.Ill.1987) (Bua, J.), and Walsh has made no effort to dispute its reasoning. Walsh himself concedes that traditionally cases like his are cast in terms of the Fourteenth Amendment; his only argument as to why the Ninth Amendment applies is of the "well, why not?" variety. Until Walsh answers "well, why?" this court will not hear him further on the Ninth Amendment.

■ Walsh proffers a more substantial argument as to his Sixth Amendment rights, although this argument too is flawed. Walsh claims that Curry and the other officers denied him his Sixth Amendment rights by not providing him with a lawyer and not halting their actions until they did so. He also claims that Curry and the others violated his *Miranda* rights, although he does not indicate which federal constitutional or statutory provision guarantees these rights. The right to *Miranda* warnings usually stems from the Fifth and Fourteenth Amendment right to be free from compulsory self-incrimination. See *Kirby v. Illinois*, 406 U.S. 682, 686, 92 S.Ct. 1877, 1880, 32 L.Ed.2d 411 (1972) (Stewart, J.). Walsh has offered no evidence that Curry or anyone else sought or received an incriminating statement from him, however, and so the defendants never violated Walsh's Fifth and Fourteenth Amendment right to be free from such efforts. Walsh cites many Illinois laws and departmental General Orders which he claims provide for *Miranda* warnings, but these rules are not a part of the Constitution or laws of the United States—a prerequisite for any suit under § 1983.

Returning to Walsh's right to counsel, the Sixth Amendment requires the state to provide an attorney in two instances: at any critical stage in a criminal prosecution, see *Kirby*, 406 U.S. at 690, 92 S.Ct. at 1882; and when a person has requested counsel in the face of deliberate attempts by police to obtain an incriminating statement, see *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964); *United States v. Cannon*, 715 F.2d 1228, 1232 (7th Cir.1983). Again, Walsh has offered no evidence that Curry or anyone else sought or obtained an incriminating statement. At worst, Curry may have threatened Walsh with criminal prosecution, but Walsh cites no authority for the proposition that the making of a threat of

---

**2.** It is conceivable that they may have slandered him, however. The court will address this con-

tention below.

prosecution is a "critical stage" in a criminal prosecution. Walsh cites numerous state law and union contract provisions that purportedly guaranteed him counsel, but again he never suggests how these guarantees stem from federal law. The federal right to counsel is narrow, and Walsh never demonstrates how it covers his situation. This court thus holds that the defendants did not violate Walsh's Sixth Amendment right to counsel.

■ This leaves Walsh with his Fourteenth Amendment claims. Walsh asserts that Curry and the others deprived him of property and liberty in violation of the Due Process Clause. The court will address Walsh's property claim first. Walsh contends that he had a property interest in his job and that the City, through Curry, deprived him of it without giving him due process. The defendants concede that Walsh's job was his property, but they deny that anyone deprived him of it; rather, they claim that Walsh resigned his position. Walsh argues that his resignation was involuntary, and thus effectively it was a deprivation.

■ That Walsh resigned, rather than was fired, is important. In cases involving claims of deprivation of property without due process of law, the courts presume that a resignation is voluntary unless the former employee can establish that it was involuntary. See *Alvarado v. Picur*, 859 F.2d 448, 453 (7th Cir.1988); *Christie v. United States*, 518 F.2d 584, 587, 207 Ct.Cl. 333 (1975). Walsh claims that his resignation was involuntary as a matter of fact and of law. A resignation is deemed to be involuntary in fact when the former employee demonstrates that (1) he or she involuntarily accepted the terms of his or her employer, (2) circumstances permitted no other alternative, and (3) the circumstances were the result of coercive acts of the employer. *Id.*, quoting *Fruhauf Southwest Garment Co. v. United States*, 111 F.Supp. 945, 126 Ct.Cl. 51 (1953). The court must measure these facts against an objective standard. *Christie*, 518 F.2d at 587.

The evidence that Walsh has submitted does not create a genuine issue of material fact as to whether the circumstances surrounding his resignation permitted no other alternative, or that the circumstances were the result of coercive acts of the defendants. The evidence is undisputed that Walsh had an alternative: he could have chosen to stand his ground. Before talking to Curry Walsh had signed a form that set a time and place for a hearing. He was aware that he could have counsel and could present evidence at this hearing, and thereby try to clear his name. While Curry made this option undesirable, this alone does not destroy it. See *Alvarado*, 859 F.2d at 453 (presenting employee with unpleasant alternatives does not obviate the opportunity to choose between them).

Walsh claims that under the circumstances his choice was not meaningful: he was distraught, not knowing where his children were or how his wife was being treated. If these circumstances somehow overcame Walsh's will—and the evidence is not clear that they did—they were not the result of the defendants' coercive acts. If Walsh's worst fears had been true, his children would have been in the custody of DCFS. Walsh puts forth no evidence why this amounted to an unlawful threat to his children. See Restatement (Second) of Torts §§ 58, 892B comment g (1965) (mistaken threat of force against member of person's immediate family can constitute duress against person only if the mistake is substantial, known to the actor, and concerning nature of harm expected). Similarly, the police did not act coercively in arresting Hannah Walsh and placing her in jail. Walsh feared for her safety, but he introduces no evidence that he believed that the defendants had instructed the persons incarcerated with his wife to harm her in any way. Objectively examined, the facts indicate no coercion other than perhaps that placed by Walsh upon himself.

■ Walsh argues further that as a matter of law Curry coerced him by threatening him with prosecution for crimes which Walsh did not commit. Under federal law, an employer's threat of prosecution is

deemed coercive if the former employee demonstrates that the employer knew or believed that the criminal charges were false. See *Rich v. Mitchell*, 273 F.2d 78 (D.C.Cir.1959). Unlike the analysis of coercion in fact, the analysis of "false prosecution" coercion is subjective: did the *employer* know or believe that the charges were false? Walsh submits no evidence indicating that Curry so believed or knew. The undisputed evidence is that Curry knew only what Kane and Zdora reported, which is indicated by his signatures on their internal memoranda. Walsh provides plenty of evidence that what Kane and Zdora reported was incorrect—that Hannah never implicated him, that his urine contained no traces of cocaine, and the like—but he submits no evidence that Curry was aware of these facts at the time he pressured Walsh to resign. Walsh thus cannot defeat the defendants' motion for summary judgment on his Fourteenth Amendment claims of a deprivation of property without due process of law.

■ Walsh's final constitutional claim is for deprivation of liberty.

"A government employee's liberty interests are implicated where in terminating the employee the government 'make[s] any charge against [her] that might seriously damage [her] standing and association in the community' or 'impose[s] on [her] a stigma or other disability that foreclose[s] [her] freedom to take advantage of other employment opportunities.'"

*Ratliff v. City of Milwaukee*, 795 F.2d 612, 625 (7th Cir.1986), quoting *Doe v. United States Department of Justice*, 753 F.2d 1092, 1105 (D.C.Cir.1985) (bracketed material from *Ratliff*). Such a deprivation is wrongful when the charges are false or defamatory. See *Ratliff*, 795 F.2d at 625. *Ratliff* does not suggest why a deprivation of liberty can occur only when a government terminates an employee, as opposed to when the government seeks an employee's resignation. The defendants do not argue the point, however, and so for purposes of this motion the court will assume that a deprivation of liberty could have occurred under the present circumstances.

The defendants challenge more particularly Walsh's contention that they are responsible for any stigma or disability allegedly imposed upon him. Walsh claims that they are responsible for the false statements that he contends were circulating in the 8th District Headquarters following his resignation. The problem with this argument—one that proves fatal not only to Walsh's federal claim of deprivation of liberty, but his state law claim of slander as well—is that Walsh never presents evidence that the defendants were responsible for these stories. Walsh claims that under the common law, if a reasonable person would recognize that person A's act creates an unreasonable risk that person B will communicate defamatory matter to person C, the law will ascribe the intent of person B to person A. See Restatement (Second) of Torts § 577(1) & comment k. Walsh uses this logic to ascribe to the defendants the statements made by Lt. Burns and Commander Corless, as well as the 8th District scuttlebutt. But Walsh has introduced no evidence that the defendants' acts prompted Burns, Corless, or the operators of the 8th District rumor mill to say what they said. All that Walsh offers is unsubstantiated conjecture, which is insufficient to thwart a motion for summary judgment. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986) (party who fails to go beyond the pleadings to show the existence of a genuine factual issue on an element essential to the party's case faces summary judgment in favor of opponent).

This court thus holds that Lt. Curry did not act to deprive Walsh of his liberty without due process of law.[3] This substantially weakens Walsh's attacks on the con-

---

**3.** This court's holding that Lt. Curry did not violate Walsh's constitutional rights carries with it the implication that Curry was entitled to qualified immunity. See *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed. 2d 396 (1982) (government official is immune from liability so long as his or her conduct does not violate a clearly established statutory or constitutional rights of which a reasonable person would have known).

duct of the other defendants. Walsh alleges, for example, that Sgt. Tasch acted wrongfully in not telling him that police had arrested and jailed Hannah, in not giving him "notice" prior to the trip to the Medical Section, and in delivering him to Curry for the allegedly illegal "interrogation." But Curry's "interrogation" did not violate Walsh's federal rights. If Curry did not violate Walsh's federal rights, Sgt. Tasch could not have violated them by merely delivering Walsh to Curry to be pressured. Walsh cannot point to any federal law that required Tasch to tell him of his wife's arrest, so that claim fails. As for notice, the evidence is undisputed that Tasch gave Walsh forms which set forth the charges against him, and Walsh acknowledged them. If federal law required notice in this situation, Tasch gave it. Tasch thus did not violate Walsh's federal rights.

■ Walsh accuses Sgt. Zdora and Officer Kane of two wrongs: aiding Curry in his illegal "interrogation" and giving false statements about his alleged drug use. The former wrong, as demonstrated earlier, is not a constitutional wrong. This court thus cannot hold Zdora and Kane liable under § 1983 for assisting Curry. As for the latter conduct, Walsh does not indicate which federal constitutional or statutory provision Zdora and Kane violated in providing false information. The Due Process Clause does not require government officers to be truthful; it requires only sufficient procedures to demonstrate untruthfulness and thereby rebut any resulting negative inferences. Walsh never demonstrates how Zdora and Kane deprived him of this right, and thus his claims of constitutional deprivation once again fall.

Walsh then turns to Leonard Zaleski, the Department's Assistant Deputy Superintendent. Walsh accuses him of not doing enough to learn that the accusations against Walsh were unfounded, wrongfully recommending acceptance of his resignation despite the lack of support for the underlying charges, and being inattentive to Walsh's rights by allowing Curry to coerce a resignation from him. Because Curry did not act unlawfully in obtaining Walsh's resignation, this court cannot hold Zaleski liable for having allowed Curry to do what he did.

Walsh's other claim against Zaleski reflect weaknesses similar to those seen earlier. Walsh insists that Zaleski should have seen to it that the charges against him were better substantiated, but Walsh does not indicate which federal law requires this. To the contrary, as noted above, absent proof from the former employee that his resignation was involuntary, a court presumes that a resignation is voluntary; this court can hardly fault an employer on constitutional or statutory grounds for failing to operate under a different presumption. It is undisputed that as far as Department officials knew, Hannah Walsh implicated Officer Walsh; it is only in hindsight that anyone has submitted evidence challenging this premise.

This brings the court to Fred Rice, Jr., Chicago's former Police Superintendent. Walsh accuses Rice too of inattention to his rights, but as demonstrated above, none of the other defendants violated Walsh's federal rights, so this court must exonerate Rice along with them. Walsh appears to have tied the liability of the City of Chicago to Rice's individual liability, and thus since Rice has prevailed, so must the City. All of the defendants are thus entitled to summary judgment on Count 1 of Walsh's complaint. As for Count 2, it alleges a conspiracy to commit the misconduct alleged in Count 1. As Count 1 goes, so must Count 2.

This leaves Walsh with his state law claims, as stated in Counts 5–6. This court exercises jurisdiction over these claims as part of its pendent jurisdiction, as Walsh has raised substantial federal claims (albeit unsuccessfully) which share a common nucleus of fact and law with his state law claims. The parties expect all of these claims to be tried here (no one has challenged jurisdiction or urged this court to ignore Counts 5–6 if the defendants received judgment on Counts 1–2), and as the court has dealt with some of their issues

already, it is in the interest of judicial economy for this court to reach the motions pertaining to those counts. See *Graf v. Elgin, Joliet and Eastern Ry. Co.*, 790 F.2d 1341, 1347–48 (7th Cir.1986) (federal courts may retain jurisdiction over pendent state claims when court has committed substantial judicial resources to resolution of case, such that sending the parties to state court will result in duplication of effort).

■ In Count 5, Walsh alleges slander (actually, defamation) under Illinois law. Walsh claims that the defendants are responsible for the communication of the three pieces of false information noted earlier. The defendants, however, claim that Walsh has failed to submit any evidence that they caused dissemination of this information. Illinois requires the plaintiff to demonstrate such causation, even if only by showing the defendant's negligence. See *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 273 (7th Cir. 1983) (applying Illinois law—at a minimum, plaintiff in defamation case must prove defendants acted negligently in causing dissemination of information). The defendants are thus entitled to summary judgment on Count 5 of Walsh's complaint.

■ This leaves the court with Walsh's claim for breach of his union contract. It is undisputed that that contract contained grievance procedures, as set forth in its ninth Article. Section 9.8 of that Article provides: "It is the intent of the parties to this Agreement that the procedures set forth in this Article shall be *mandatory* as to *any* grievance unless expressly and specifically excluded by the terms of this Agreement." (Emphasis added) It is further undisputed that despite this language, Officer Walsh did not avail himself of the contract's grievance mechanisms.

It is settled under federal and Illinois law that a worker must exhaust the grievance mechanisms of a union contract before filing suit, absent a breach by the union of its duty of fair representation. See *Vaca v. Sipes*, 386 U.S. 171, 184–86, 87 S.Ct. 903, 913–14, 17 L.Ed.2d 842 (1967); *Cosentino v. Price*, 136 Ill.App.3d 490, 91 Ill.Dec. 15, 18, 483 N.E.2d 297, 300 (1985). Walsh

makes no claim that the Fraternal Order of Police breached its duty of fair representation. He does assert that a union officer told him after his resignation that he would have to hire his own lawyer to challenge the Department, but Walsh does not show how this action was wrongful, arbitrary, discriminatory, or in bad faith. See *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916. The court can reach only one conclusion: Walsh has not properly exhausted his contractual remedies. He thus cannot press his claim for breach of contract.

For the reasons stated above, the court grants the defendants summary judgment on all of Walsh's claims.