Richard ANGARITA, Edward Kyle, and Thomas Patrick Murphy, Appellees,

v.

ST. LOUIS COUNTY, Col. Gilbert Kleinknecht, Mjr. Ronald Battelle, Sgt. John McCrady, Capt. Vincent Manning, Sgt. Donald Hasseldiek, and Sgt. Hugh Hodges, Appellants.

No. 90–2961.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1991.

Decided Dec. 9, 1992.

Gerre Langton (argued), Steven K. Jones, and Mary Anne Lindsey, St. Louis, MO, on the brief, for appellants.

Jess W. Ullom (argued), and Randall B. Kahn, St. Louis, MO, on the brief, for appellees.

\* The HONORABLE ELMO B. HUNTER, Senior United States District Judge for the Western District of Missouri, sitting by designation.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges and HUNTER,\* Senior District Judge.

ELMO B. HUNTER, Senior District Judge.

## I. STATEMENT OF THE CASE

This is an appeal from a jury verdict entered May 11, 1990, in the United States District Court for the Eastern District of Missouri.[1] Jurisdiction of the district court was invoked under 28 U.S.C. §§ 1331 and 1343. Jurisdiction of this Court is invoked under 28 U.S.C. § 1291.

## II. PROCEDURAL BACKGROUND

On November 21, 1986, Richard Angarita, Edward L. Kyle, Jr., and Thomas Patrick Murphy (hereinafter "appellees") filed a complaint seeking damages and equitable relief against Gilbert Kleinknecht, Ronald Battelle, Vincent Manning, Donald Hasseldiek, Hugh Hodges, John McCrady and St. Louis County (hereinafter "appellants"). Appellees alleged that appellants deprived them of their property rights in continued employment by coercing them into resigning their positions with the St. Louis County Police Department.

On October 23, 1989, a trial by jury commenced, and on October 30, 1989, the jury found in favor of Angarita on his due process claims and assessed actual damages against St. Louis County, Kleinknecht, Battelle, Hasseldiek, Hodges and McCrady, and assessed punitive damages against Kleinknecht, Battelle, Hasseldiek, Hodges, and McCrady. The jury found in favor of Kyle on his due process claims and assessed actual damages against St. Louis County, Kleinknecht, Battelle, Manning, Hodges and McCrady, and assessed punitive damages against Kleinknecht, Battelle, Manning, Hodges and McCrady. The jury found in favor of Murphy on his due process claims and assessed actual damages against St. Louis County, Kleinknecht, Battelle and McCrady, and assessed punitive

1. The Honorable Edward L. Filippine, presiding.

damages against Kleinknecht, Battelle and McCrady. On May 11, 1990, the district court entered its judgment in favor of appellees and against appellants and awarded appellees actual and punitive damages in accordance with the jury verdict. On October 15, 1990, the Court entered its judgment, awarding appellees attorneys' fees and expenses. On November 13, 1990, appellants filed the instant notice of appeal.

## III. STATEMENT OF FACTS

Although there are as many versions of the facts as there are witnesses to the incidents, this Court has attempted to set forth the facts objectively and accurately.[2]

### III.A. *Background*

In March of 1984, drug enforcement agency officers informed Colonel Gilbert Kleinknecht, Superintendent of Police, that Debbie Rogers had information concerning officers appropriating and using drugs seized in their investigations and engaging in sexual misconduct. Appellees were not specifically mentioned by name to Kleinknecht. Kleinknecht immediately conveyed this information to Major Ronald Battelle, Executive Director of the Division of Auxiliary Services. Battelle assigned Donald Hasseldiek to assist in this investigation. Battelle and Hasseldiek met with Debbie Rogers in March of 1984, wherein Rogers stated that she first met Angarita, Kyle and Steve Rogers[3] at a party in Creve Coeur Park in early 1981. She met Murphy in her relations with the Frontenac Police Department. Debbie Rogers further stated she had sexual intercourse with these officers, that drugs were used in her presence, and that she attended parties where appellees were drinking, using drugs and having sex. She indicated that transportation was conducted in a police car and that Steve Rogers was skimming money provided to narcotics officers for drug buys. Debbie Rogers was interviewed two additional times prior to April 4, 1984. Battelle and Hasseldiek also interviewed Officer Bilyk, inasmuch as his name was mentioned by Debbie Rogers. Officer Bilyk told them about drinking parties where sexual activity occurred and about the "White Castle" incident.[4]

On April 3, 1984, Major Battelle met with Sergeant Hasseldiek, Captain Manning, Sergeant McCrady, Sergeant Hodges and Sergeant Sullivan to inform them of the misconduct allegations. Battelle indicated that interviews of the appellees would be conducted on April 4, 1984.[5]

---

**2.** Appellants have attempted to argue the evidence to this Court. However, this Court must consider the evidence in the light most favorable to the plaintiffs. *Morgan v. Arkansas Gazette*, 897 F.2d 945, 948 (8th Cir.1990).

**3.** From the record, it appears as if Steve Rogers is no relation to Debbie Rogers.

**4.** The "White Castle" incident is where Officer Bilyk walked into a White Castle restaurant without trousers. Other officers were present and intoxicated and police cars were being used for transportation. This occurred in 1980. Bilyk confirmed the "White Castle" incident and the fact that there were parties involving sexual activities. He further stated that he had skimmed money from drug enforcement funds.

**5.** It is of interest to note that the only complaint appellees received prior to this meeting was a "White Castle" complaint which was signed by Major Mizell, who was not a witness to this incident.

Section III of Order 85–5 states that complaints must be reduced to writing and signed by the person making the complaint and that the person initiating the complaint must have witnessed the incident or had reliable knowledge of the incident.

Under Section V, an "accused employee will be notified in a verbal, confidential manner of the essential information of the complaint." At that time, an agreement will be effected as to a location where the accused employee can meet with a representative of the Bureau of Internal Affairs and receive a copy of the complaint. After notification, the employee's immediate supervisor will also be notified.

Under Section VIII, employees are permitted to have one of their supervisors present during an interview pertaining to an investigation. Further an employee's rights include the following:

(1) all interviews will be conducted while the employee is on duty;

(2) only one interviewer will ask the employee questions;

(3) prior to answering any questions, employees shall be informed of the allegations made against him and receive a copy of the original complaint;

(4) employees shall not be subjected to offensive language, nor threatened with transfer, dismissal or disciplinary action; and

On April 3, 1984, Angarita,[6] Kyle,[7] and Murphy [8] were contacted, misrepresentations were made to them and they were instructed to appear at the station on April 4, 1984.

### III.B. *Angarita, Kyle and Murphy Directed to the Same Room and then Split Up*

When Angarita, Kyle and Murphy were all in the room at Internal Affairs, Battelle told Hasseldiek to take their guns, badges and I.D. cards. Battelle then motioned toward Cook and Holmes and told them to "book" Rogers and "as a matter of fact, book them all." Appellees were then handed a complaint and interview notification form to sign. When Murphy asked for an explanation, he was told by McCrady to "just sign it, shut up and sign it, you don't have no choice in the matter, you don't have any rights." Appellees were then split up and taken into separate rooms.

### III.C. *Murphy's Interrogation*

Murphy was initially interviewed by McCrady and told that, "You are not leaving with your job, nobody's going nowhere with their jobs." A few minutes later, Battelle came into the room and told Murphy that if he is caught in any lies, he "can be terminated." When Battelle left the room, McCrady handed Murphy a copy of the "White Castle" complaint. Murphy admitted to being present but stated that he was off duty and not intoxicated. Murphy further stated that Angarita was not at the "White Castle" incident and was not in the narcotics unit at that time. At this point, McCrady began discussing the allegations

regarding parties at Creve Coeur Park, sexual misconduct, discharging weapons and skimming money. Murphy advised McCrady that there must be a formal written complaint pursuant to St. Louis County Police Department policy if these discussions were to continue. Murphy's requests to see his supervisor and an attorney were repeatedly denied. On one occasion, McCrady told Murphy that he had no rights, inasmuch as this was an administrative hearing.

After thirty minutes of questioning, McCrady turned on the tape recorder and began discussing the "White Castle" complaint and allegations of misconduct. Murphy admitted that he and other officers from the drug enforcement unit would go to Creve Coeur Park and have a few beers on their way home from work. Murphy admitted to engaging in sexual relations with Debbie Rogers and having oral sex with a woman at Steve Rogers' house, while Murphy was off duty.[9] Murphy denied any and all allegations of drug use, supplying informants with drugs, stealing property, discharging firearms and skimming money. McCrady indicated to Murphy that the press was involved and "it could be very embarrassing to the department." Murphy was interviewed by Battelle, Hasseldiek and McCrady and on more than one occasion was asked questions by more than one officer at a time. Murphy was threatened with dismissal, termination, and criminal prosecution. The tape recorder was turned off at approximately 6:45 p.m. and for some time thereafter, Battelle and Hasseldiek questioned Murphy. Shortly thereafter, Murphy resigned. After his

(5) the complete interview shall be recorded, whenever conducted by the Bureau of Internal Affairs.

**6.** Angarita was hired by the St. Louis County Police Department in January of 1978 in the Fourth District. In October of 1980, he was reassigned to the Narcotics Unit and remained there until November of 1982, at which time he took a position with the Tactical Operations Unit.

**7.** Kyle was hired by the St. Louis County Police Department in November of 1978 as an officer in the First Precinct. In March or April of 1980,

he was reassigned to the Narcotics Unit and remained there until March or April of 1983, when he was reassigned to an intelligence analyst position.

**8.** Murphy was hired by the St. Louis County Police Department in June of 1977 in the Second District. In October of 1979, he was reassigned to the Narcotics Unit. In February of 1983, he was reassigned to the Bureau of Crimes Against Persons Unit.

**9.** A picture of this was shown to Murphy at the close of the interview. McCrady told Murphy that this picture would be in the newspaper.

resignation, Murphy asked to see Kyle and Angarita.

### III.D.  *Kyle's Interrogation*

Kyle was initially interrogated by Manning.  Manning presented Kyle with a Bureau of Internal Affairs Employee Complaint Interview Notification Form, which he signed at 3:45 p.m.  Manning gave Kyle the "White Castle" complaint, at which point, Kyle asked Manning if he could have his supervisor present, and Manning stated that no one could be present at that time. Battelle walked into the interrogation room and told Kyle, "You're going to answer all of the questions we pose to you in no uncertain terms.  You're not going to have the right to talk to anybody."  Manning then turned the tape recorder on and went about the initial formalities of the interrogation regarding the "White Castle" incident.  Kyle admitted to being present at the "White Castle" incident and to drinking, but stated that both he and Murphy were off duty.[10]

Manning questioned Kyle about allegations of drinking, parties, sexual misconduct and skimming money.  Kyle admitted taking a police car to Creve Coeur Park while off duty, but denied being intoxicated or having sexual relations while on duty. Kyle denied discharging his firearm at Creve Coeur Park, using drugs, and skimming money.  Kyle admitted to having sex with a woman other than his wife at a hotel while off duty.  During the interrogation, Battelle and Manning also accused Kyle of taking narcotics money and using it to build additions onto his home.  Kyle denied these charges and offered to provide documents to prove that the money came from his mother and father.  He was not permitted to contact his wife so as to secure the documents.

Kyle's interrogation started at 3:50 p.m. and lasted until 9:30 p.m.  The tape recorder was permanently turned off around 6:30 p.m. while Kyle continued to be interrogated by Manning, Battelle, Hodges and McCrady.  On a number of occasions, Battelle told Kyle that Colonel Kleinknecht had indicated that Kyle would not leave with his job and that "before you leave here, you no longer will be a policeman." Battelle and Manning told Kyle that all of the allegations would probably get to the press and a news release issued.  Thus, it would be in the department's and his best interest for him to resign.  Further, Manning stated that there was a very strong chance that Kyle would be booked for a DWI before leaving.

Shortly before his resignation at around 9:30 p.m., McCrady told Kyle that Battelle and Manning were on their way to his house to tell his wife about his girlfriends. McCrady told Kyle that the only thing that he could do to keep Battelle and Manning from going to his house, would be to resign immediately.  After Kyle indicated that he wished to resign, Manning came into the room and told Kyle exactly what to write in his resignation.

### III.E.  *Angarita's Interrogation*

Angarita was taken into a separate room at approximately 3:45 p.m. by Hodges. Hodges initially told Angarita that they were going to talk about some complaints that had been made.  About 15 minutes later, Battelle came into the room and told Angarita that his job was gone and he would "go either the easy way or the hard way" but either way, "you're gone."  Angarita was then presented with the "White Castle" complaint.  Angarita denied being involved in the "White Castle" incident and stated that he was not even working in the Drug Enforcement Unit at that time. Hodges then questioned Angarita about misconduct at Creve Coeur Park and hotels, the discharging of his weapon, drug use, sexual misconduct and skimming of money.  Battelle, Hasseldiek and McCrady also questioned Angarita regarding these allegations.  Angarita's requests to see his supervisor and the right to take a polygraph exam were denied.  Angarita denied

---

**10.**  Appellants asserted that he was intoxicated at the "White Castle" incident party, but Kyle denied that.

ever having sex with anyone while on duty, discharging a firearm in an unwarranted situation, being intoxicated, taking drugs while on duty, and skimming money from the narcotics unit. Angarita admitted to being present at Creve Coeur Park parties, where alcohol was consumed, and to using a department vehicle to go to the Creve Coeur Park. Throughout the interrogation, which began at approximately 3:50 p.m. and ended around 9:00 p.m., only five minutes was spent discussing the "White Castle" incident. The tape recorder was turned on at around 4:15 p.m. and turned off at 7:30 p.m. At various times, Battelle, Hodges and McCrady told Angarita that he wasn't leaving with his job. Both Hodges and Battelle told Angarita that Colonel Kleinknecht had stated that he was not going to leave with his job. Angarita was told a few times by Hodges that there may be some criminal charges and "there's a good possibility that you are going to wind up in the county jail."

Between 7:30 and 9:00, when the tape recorder was turned off, Angarita was interrogated by Hodges and Battelle, who told him that this would be embarrassing for him and his family if he didn't resign. Further, it would end up in the paper and his wife would be told. Battelle and Hodges began talking about his wife and indicated that they were going to go to Angarita's house and bring his wife into this. Angarita then resigned at approximately 9:00 p.m.

Kleinknecht never participated in any of the interviews, however, he was present at headquarters during the interrogations. Battelle admitted to actually interrogating Kyle and having "conversations" with Murphy and Angarita during their interrogations. Battelle also admitted to meeting with Kleinknecht two or three times during the evening of April 4, 1984.

### III.F.  *Pierce's Interrogation*

On April 4, 1984, Sergeant William Pierce saw Battelle at the Second Precinct and was told to go to headquarters. Kleinknecht, Manning and Hasseldiek accompanied Pierce and Battelle to Internal Affairs. Upon arriving, Hasseldiek told Pierce that he should be ashamed of himself and that he was causing undue embarrassment to the department. Pierce was then taken to a room and, after a few minutes, Battelle and Manning came into the room and told Pierce that three officers had been fired and one officer was in jail and that he had better not lie because they already had the answers. Battelle told Pierce that if he didn't cooperate, he would take the whole matter to his wife and family. Pierce was then handed a copy of the "White Castle" complaint. Pierce asked who was making the complaint, and, Battelle, while writing his name on the bottom, stated, "I'm making the complaint." Pierce's requests to have a supervisor or attorney present were repeatedly denied.

Hasseldiek interrogated Pierce about the allegations that had been made regarding appellees. At the time of the alleged misconduct, Pierce was a supervisor in the narcotics unit. Pierce stated that the parties in Creve Coeur Park had been going on for twenty years and that he had seen McCrady and Hodges at these parties in the past. Pierce had never seen anyone at these parties from the narcotics unit while they were on duty and had never seen any drug use there. The tape recorder was turned off a number of times during the interrogation. At one point, Battelle told Pierce that he should think about taking a reduction in rank. When Pierce told Battelle that he would neither resign nor take a reduction in rank, Battelle took his gun and badge. Battelle told Pierce that Kleinknecht wouldn't allow him to stay under the circumstances. After more badgering, Pierce wrote out a request for reduction in rank. Battelle left the room with the request and came back and told Pierce that Kleinknecht wanted a voluntary reduction in rank. Pierce then wrote exactly what Battelle dictated to him.

## IV.  SUBMISSIBILITY OF ACTION UNDER 42 U.S.C. § 1983

Appellants assert that plaintiffs-appellees failed to set forth a submissible case against the defendants under 42 U.S.C. § 1983. Appellants assert that the evi-

dence failed to overcome the presumption that plaintiffs voluntarily resigned their positions with the St. Louis County Police Department. Appellants conclude that the district court erred in failing to grant their motion for a directed verdict or a judgment notwithstanding the verdict or a new trial. Second, appellants assert that insufficient evidence was produced to show that defendant Kleinknecht deprived plaintiffs of their due process rights. Third, appellants further assert that plaintiffs failed to demonstrate the existence of a policy giving rise to the deprivation of their due process rights.

### IV.A. *Standard of Review*

In reviewing the district court's denial of a motion for directed verdict and/or a judgment notwithstanding the verdict, this court must apply the same standard as the district court, *Morgan v. Arkansas Gazette*, 897 F.2d 945, 948 (8th Cir.1990), which requires this Court to:

(1) Consider the evidence in the light most favorable to the party who prevailed with the jury;

(2) Assume that all conflicts and the evidence were resolved by the jury in [appellees'] favor;

(3) Assume as proved all facts which [appellees'] evidence tended to prove;

(4) Give [appellees] the benefit of all reasonable inferences which may have reasonably been drawn from the facts proved; and

(5) Affirm the denial of the motion if reasonable persons could differ as to the conclusions to be drawn from it.

The denial of a motion for judgment notwithstanding the verdict may be reversed only when the evidence viewed in the light most favorable to the nonmoving party points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. *Johnson v. Bowers*, 884 F.2d 1053, 1056 (8th Cir.1989). A review of the denial of a motion for new trial is even more limited in that it is within the sound discretion of the trial court and will be reversed only upon a showing that the Court abused its discretion. *Ryko Mfg.*

*Co. v. Eden Services*, 823 F.2d 1215, 1221–22 (8th Cir.1987).

### IV.B. *Presumption of Voluntariness of Resignation*

■ Appellants assert that appellees failed to overcome the presumption that plaintiffs voluntarily resigned their positions. A resignation is presumed voluntary, unless the employee comes forward with sufficient evidence to establish that the resignation was involuntarily extracted. *Alvarado v. Picur*, 859 F.2d 448, 453 (7th Cir.1988), and *Christie v. U.S.*, 207 Ct.Cl. 333, 518 F.2d 584, 587 (1975). If the resignation is found voluntary, the procedural rights to which the employee is otherwise entitled are waived. *Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167, 173 n. 7 (4th Cir.1988).

■ Under the "duress/coercion" theory, a resignation may be found involuntary if, from the totality of the circumstances, "it appears that the employer's conduct in requesting or obtaining the resignation effectively deprived the employee of free choice in the matter." *Id.* at 174. Factors to be considered in determining whether an employee was coerced are:

(1) Whether the employee was given an alternative to resignation;

(2) Whether the employee understood the nature of the choice he was given;

(3) Whether the employee was given a reasonable time in which to choose;

(4) Whether the employee was permitted to select the effective date of the resignation.

*Id.*

A resignation is deemed involuntary in fact when:

(1) The employee involuntarily accepted the terms of his or her employer;

(2) The circumstances permitted no other alternative; and

(3) The circumstances were the result of coercive acts of the employer.

*Walsh v. City of Chicago*, 712 F.Supp. 1303, 1308 (N.D.Ill.1989). The above factors are to be measured by an objective standard, as opposed to the employee's sub-

jective evaluation of a situation. *Christie*, 518 F.2d at 587.

■ Considering the totality of the circumstances, appellees presented sufficient evidence to rebut the presumption that their resignations were voluntary. Appellants argue that the plaintiffs did not indicate how their conduct overcame appellees' will. In reading through the record, the evidence dictates that appellees' will was overcome. Appellees were not permitted to leave without resigning first;[11] no alternatives were given; a very restricted amount of time was given to decide; they were not permitted to select the effective date of their resignation; no specific complaint of their actions was presented to them; their requests to speak with their supervisors or have them present were continually denied; one appellee was denied the request to speak with his family so as to obtain documentation to support his defenses; they were threatened with disclosure of the allegations to their family; they were threatened with adverse publicity in the media; a tape recorder was turned off many times during the interrogation; they were not told the source of the allegations; they were asked to turn in their guns and badges before being interrogated; they were told that they would not leave with their jobs; they were told that Colonel Kleinknecht had already decided that they would be fired; they were threatened with arrest; and they were interrogated continuously for several hours; among other things.[12] In conclusion, from an objective standard the record clearly depicts facts which support a finding that an employee's will would be overcome under the same or similar circumstances. *Christie*, 518 F.2d at 587.

Appellants argue that when employees choose to resign rather than defend themselves in a dismissal hearing, the resignation does not constitute coercion. This statement blatantly ignores the findings of the jury and the objective realities of the situation facing the appellees. There was absolutely no choice. In fact, the only alternative presented was that they could continue to refuse to give in to the high pressure and permit their families to be contacted, to be placed in jail and fired, and to be publicly embarrassed in the media. *See Stone*, 855 F.2d at 174 (objective assessment must be made as to whether real alternatives were offered). The record supports the finding that appellants came forward with sufficient evidence to establish that the resignations were involuntarily extracted.

### IV.C. *Sufficiency of Evidence to Show Kleinknecht's Involvement*

■ Appellants assert that a submissible case was not made against Kleinknecht, inasmuch as no evidence was produced to show that Kleinknecht did anything to deprive appellees of their due process rights. For Kleinknecht to be held liable under Section 1983 for conduct of his subordinates, he must have participated to some extent in that conduct, *see Wilson v. North Little Rock*, 801 F.2d 316, 322–23 (8th Cir. 1986), and known about and facilitated the conduct, approved it, condoned it, or turned a blind eye for fear of what others might see. *Jones v. Chicago*, 856 F.2d 985, 992–93 (7th Cir.1988). In other words, he must have acted either knowingly or with deliberate, reckless indifference. *Id.*

■ Here sufficient evidence was produced for the jury to find that Kleinknecht had known every step his officers were taking and had either tacitly or actually approved every act. Angarita and Kyle testified that they were told during interrogation that Kleinknecht was not going to allow them to leave with their jobs. Battelle spoke with Kleinknecht during

---

**11.** *See Stone*, 855 F.2d at 174.

**12.** The majority of these acts were in violation of internal regulations of the St. Louis County Police Department. These, in and of themselves, are not due process violations. They all contribute to the totality of circumstances which led to appellees' coerced resignations.

Kleinknecht testified that, in his view, the purpose of establishing these rules and regulations was to lend fairness in the interview process. However, when an interrogation is being conducted contrary to a department's own rules, it is only natural that the employee succumbs to the pressure of the employer.

Pierce's interrogation. Kleinknecht was in the building and available to the other appellants throughout the interrogations during the evening of April 4, 1984.[13] The record does not support the assertion that Kleinknecht had no knowledge of the events occurring on April 4, 1984, and had no power to stop the events. The evidence supports the jury's finding that he, at least, approved of and condoned the activity, and, in all likelihood, facilitated the activity.[14]

Appellants assert that these statements and actions were refuted by the testimony of Kleinknecht and Battelle. Clearly, the jury was entitled to disbelieve this testimony and infer that Kleinknecht knew of and approved of the actions taken by his subordinates. *See id.*[15]

Appellants assert that the award of punitive damages against Kleinknecht was not appropriate. A jury is permitted to assess punitive damages under Section 1983 when a defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the constitutional rights of others. *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983). The evidence before the jury was sufficient to find that Kleinknecht knew what was going on; participated and approved of the activities; and acted with reckless and callous indifference to the rights of appellees. The submission of punitive damages and consequent award by the jury was reasonable and proper.

### IV.D. *Existence of St. Louis County Policy Giving*

### *Rise to Deprivation of Due Process Rights*

Appellants argue that appellees failed to set forth a submissible case under Section 1983 against St. Louis County inas-

much as there was insufficient evidence to demonstrate the existence of a custom or policy to deprive appellees of their due process rights. A municipality may be held liable under Section 1983 only if a municipal custom or policy caused the deprivation of the right protected by the constitution or federal laws. *Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). A policy may be either a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the municipality's governing body. *St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988). Municipal officials who have final policymaking authority may, by their actions, subject the government to Section 1983 liability. *Id.* at 123, 108 S.Ct. at 924. Moreover, the challenged action must have been taken pursuant to a policy adopted by the official responsible under state law for making policy in that area of the city's business. *Id.*

An unconstitutional governmental policy can be inferred from a single decision taken by the highest official responsible for setting policy in that area of the government's business. *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *Owen v. Independence,* 445 U.S. 622, 633, 100 S.Ct. 1398, 1406, 63 L.Ed.2d 673 (1980); and *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). In *Pembaur,* the Supreme Court upheld a finding of municipal liability for the violation of plaintiffs' constitutional rights where deputy sheriffs acted on the express instruction of the county prosecutor. Because the county prosecutor was acting as a final decision maker at the time, the Court concluded that the county could be held liable under Section 1983. *Id.* 475 U.S. at 484–85, 106 S.Ct. at 1301. *Praprot-*

---

**13.** Appellants and appellees argue the evidence as to whether Kleinknecht ever spoke specifically with Battelle, but this issue need not be resolved for the purpose of this appeal.

**14.** Kleinknecht participated in bringing Sergeant Pierce into headquarters under the same false pretenses as appellees. Additionally,

Kleinknecht, through Battelle, dictated to Pierce exactly what he wanted Pierce to do.

**15.** Proof of actual knowledge of constitutional violation is not an absolute prerequisite for imposing supervisory liability. *Howard v. Adkison,* 887 F.2d 134, 138 (8th Cir.1989). Reckless disregard will suffice to impose liability. *Id.*

*nik* reaffirmed that "the authority to make municipal policy is necessarily the authority to make final policy." *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their "decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur." *Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). As a final policymaker for the department, any action taken by Kleinknecht constitutes the policy of St. Louis County in these circumstances. *See Messick v. Leavins,* 811 F.2d 1439 (11th Cir.1987) *reh. den, en banc,* 817 F.2d 761 (11th Cir.1987) (superintendent of public works had final policymaking authority, thereby binding city) and *Pembaur,* 475 U.S. at 481–83, 106 S.Ct. at 1299–1300, (a municipality is liable under Section 1983 for actions directed by an official who establishes governmental policy whether that action is taken only once or repeatedly).

Kleinknecht had final policymaking authority in the St. Louis County Police Department; was the highest ranking police official in St. Louis County; was responsible for the entire department; and was responsible for drafting and approving many of the department's general orders. The actions taken by Kleinknecht in his official capacity in this situation are sufficient to impose liability on St. Louis County. *Flanagan v. Munger,* 890 F.2d 1557 (10th Cir.1989) (Chief of Police found to have direct management supervision over the department was sufficient to be considered final policymaker). *See also Mandel*

*v. Doe,* 888 F.2d 783, 794 (11th Cir.1989) and *McNamara v. Chicago,* 700 F.Supp. 917, 920 (N.D.Ill.1988).

There is ample evidence that the County departed from its complaint review procedures in "interviewing" Sergeant Pierce and appellees as well as through blatant misconduct and coercion. Additionally, appellees submitted evidence regarding the treatment and interrogation of appellees' supervisor, Sergeant Pierce.[16] Considering the evidence in the light most favorable to appellees and drawing all inferences which can be drawn from the testimony, appellees presented sufficient evidence to make a submissible case against Kleinknecht and St. Louis County.

## V. PREJUDICIAL EFFECT OF INSTRUCTIONS 12 AND 15

Appellants assert that their motion for new trial and/or judgment notwithstanding the verdict should have been granted. Appellants argue that instructions 12 and 15 were prejudicial, because they assumed that plaintiffs' resignations were forced. Although appellants objected to instructions 12 and 15, they failed to offer an alternative instruction to the trial court. Under the circumstances presented, even though appellants objected at trial to an instruction, that party may not complain on appeal that an instruction is misleading and ambiguous if an alternative instruction has not been offered at trial. *Grogan v. Garner,* 806 F.2d 829, 837 n. 10 (8th Cir. 1986), and *Roth v. Black & Decker, Inc.,* 737 F.2d 779, 783 (8th Cir.1984). Inasmuch as appellants failed to offer an alternative instruction at trial, their complaints on appeal are without merit.[17]

16. Pierce testified that he was whisked away to headquarters on April 4, 1984, in the same manner as appellees, by Kleinknecht, Manning and Hasseldiek. Pierce testified that he was threatened with disclosure of the allegations to his family and only a written copy of the "White Castle" complaint given to him while he was interrogated on a number of other allegations. He further testified that he was interrogated a number of times while the tape recorder was turned off and was told by Battelle that Kleinknecht wouldn't allow him to stay under the circumstances. Further, he was told exactly what to write in his request for a voluntary

reduction in rank. *See Hossman v. Blunk,* 784 F.2d 793, 797 (7th Cir.1986) (a specific pattern or series of incident supporting the general allegations must be alleged to proceed on a section 1983 claim).

17. The trial court has broad discretion in choosing the form and language of the jury instructions. *Grogan,* 806 F.2d 829 at 836. The material found objectionable is that each instruction includes the words "forced resignation". Appellants' closing argument explicitly instructed the jury that one of the issues was whether or not the resignations were forced. Here, the instruc-

## VI. SUBMISSION OF PUNITIVE DAMAGES

█ Appellants assert that the trial court erred in failing to grant a new trial or judgment notwithstanding the verdict because the submission of punitive damage claims to the jury violated the defendants' due process rights under the Fifth and Fourteenth Amendments of the United States Constitution and because there was insufficient evidence to support the submission of plaintiffs' punitive damages instructions. The assessment of punitive damages does not violate the Fifth and Fourteenth Amendment due process rights of the appellants. *Pacific Mutual Life Insurance Co. v. Haslip*, ─ U.S. ─, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). A jury is permitted to assess punitive damages in an action under section 1983 when the defendants' conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to federally-protected rights of others. *Smith*, 461 U.S. at 56, 103 S.Ct. at 1640. *Fields v. Omaha*, 810 F.2d 830, 835 (8th Cir.1987) and *Hollins v. Powell*, 773 F.2d 191, 197 (8th Cir.1985), *cert. den.* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986). The evidence supporting a finding of forced resignations also supports a finding that appellants' conduct sank to callous and reckless indifference and the finding of evil motive or intent. The instruction and award of punitive damages is clearly appropriate.

## VII. GOOD FAITH QUALIFIED IMMUNITY

█ Appellants assert that the trial court erred in determining that the defendants were not entitled to qualified immunity. The issue of good faith qualified immunity was not preserved by appellants. It was pled in their individual answers to the complaint, however, the issue was never raised during or after the trial. Appellants failed to raise the issue of qualified good faith immunity by pretrial motion. The doctrine of qualified immunity aims to keep public officials out of the court. *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). This entitlement is an immunity from suit, rather than a mere defense to liability. *Alvarado*, 859 F.2d at 450. By failing to raise this issue with the district court, appellants failed to preserve this issue for appeal. The Supreme Court confirms this in its holding that this:

> entitlement is an immunity from suit rather than a near defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. Accordingly, the reasoning that underlies the immediate appealability of an order denying absolute immunity indicates to us that the denial of qualified immunity should be similarly appealable: in each case, the district court's decision is effectively unreviewable on appeal from a final judgment.

*Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411, 425 (1985) Appellants' motion for judgment notwithstanding the verdict or new trial failed to specify qualified immunity as a ground for the court to consider, other than in the context of the refused jury instruction.[18] Accordingly, the trial court was correct in its rulings.

Accordingly, the decision of the district court is AFFIRMED.

---

tions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues to the jury. *Jones v. Bd. of Police Comrs.*, 844 F.2d 500, 504 (8th Cir.1988) *cert. denied*, 490 U.S. 1092, 109 S.Ct. 2434, 104 L.Ed.2d 990 (1989) and *Tribble v. Westinghouse Electric Corp.*, 669 F.2d 1193, 1197 (8th Cir.1982), *cert. denied*, 460 U.S. 1080, 103 S.Ct. 1767, 76 L.Ed.2d 342 (1983) (error will not be assigned for technical imperfections).

**18.** Further, the Court properly denied appellants' request to offer an instruction to have the jury determine the issue of qualified good faith immunity, because that is a question of law not fact. *See Darnell v. Ford*, 903 F.2d 556, 562 (8th Cir.1990).