Michael W. ALVARADO,
Plaintiff–Appellee,

v.

Ronald D. PICUR, Special Administrator of the Estate of Robert Curry,[1] Defendant–Appellant.

Nos. 87–1841, 87–3128.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1988.

Decided Sept. 23, 1988.

Rehearing Denied Oct. 27, 1988.

**1.** While his appeals were pending before this Court, defendant-appellant Robert Curry died. In accordance with Federal Rule of Appellate Procedure 43(a), on July 22, 1988, Curry's personal representative filed a motion for substitution. On July 26, 1988, we granted the motion and ordered Ronald D. Picur, special administrator of the Estate of Robert Curry, substituted for Robert Curry as defendant-appellant in these appeals.

Frederick S. Rhine, Corp. Counsel, Chicago, Ill., for defendant-appellant.

Carl M. Walsh, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, FLAUM and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

A jury found that Chicago police Lieutenant Robert Curry coerced Michael Alvarado into resigning from his position with the police force and that this coercion deprived Alvarado of property without due process of law in violation of the Fourteenth Amendment. The jury awarded Alvarado $55,000 in compensatory damages and $100,000 in punitive damages. We reverse because Curry had qualified immunity. The district court should have granted Curry's motion for a directed verdict on that ground and not allowed this case to go to a jury.

I

Michael Alvarado was a Chicago police officer from May 16, 1975, until he resigned on November 22, 1985. At the time of Alvarado's resignation, Lieutenant Robert Curry was the commanding officer of the Confidential and Corrupt Practices Unit of the Internal Affairs Division of the Chicago Police Department. The Unit was responsible for investigating allegations of criminal activity by police officers and in November 1985 was investigating Alvarado on allegations from three sources that he was using illicit drugs.[2]

2. As of November 1985, Alvarado was the subject of three open police department investigations. In addition to the drug investigation by Curry's unit, Alvarado was being investigated by the General Investigation Unit for an off-duty altercation in the area of State and Division

■ On November 22, Alvarado, who had been on medical leave, reported to the Police Department's Medical Section for treatment and was confronted by Curry. Within thirty minutes thereafter Alvarado resigned from the force. What transpired within those thirty minutes depends upon who is telling the story—Alvarado or Curry. When the issue of qualified immunity arises in the context of a directed verdict as it did in this case, the district court must consider the evidence in the light most favorable to the party opposing the defense; on appeal, so must we. *Rakovich v. Wade*, 850 F.2d 1179, 1204–1205 (7th Cir.1987) (*en banc*). We therefore relate Alvarado's version of those thirty minutes.

On the morning of November 22, Alvarado reported to the Medical Section, signed in, received a number and sat down to wait for the doctor. Instead of seeing the doctor, a sergeant from the Medical Section led Alvarado to a room, approximately eight feet by ten feet, containing one desk and three chairs, in which Lieutenant Curry and Sergeant Cleary were seated. Curry ordered Alvarado to sit, and following the order of his superior, he did. At that time, Curry leaned over the desk toward Alvarado and said, "I've got a million-dollar deal for you." Curry told Alvarado that he was authorized by the Superintendent of Police to offer Alvarado this million-dollar deal—if Alvarado resigned that day, he would not be indicted. Curry then told Alvarado that he wanted Alvarado's resignation and that if Alvarado did not resign Curry would pull his star, take his I.D. and put him in a little room, presumably the radio room, where he would be ridiculed and scorned by his fellow officers. Sergeant Cleary then handed Alvarado a Personnel Action form, the form used to resign, and suggested that he sign it. When Alvarado asked for some time to think it over, Curry got angry, started yelling and walked out of the room.

When Curry re-entered the room and asked Alvarado if he was ready to sign the form yet, Alvarado asked if he could post-date it. Curry told him no; that if Alvarado postdated the form, that would later involve some "scumbag" attorney and Curry did not want to deal with any attorneys. Cleary then got up and left the room, taking the unsigned resignation form with him. When he returned he had filled in the form with the statement, "I wish to resign from the Chicago Police Department for personal reasons effective 22 November 1985." Alvarado then explained to Curry that he was still being treated for his injury and that if he resigned he would not have any insurance. Curry responded that he did not care and put a pen in Alvarado's hand. Cleary pointed to the signature line, and at that point Alvarado signed.

The entire meeting took less than thirty minutes. Although neither Curry nor Cleary used or threatened to use physical force, Alvarado stated that he was nevertheless confused and devastated by what was said; particularly by Curry's statements that he was going to put Alvarado up to the ridicule of his fellow officers and citizens and that Alvarado was going to jail, the latter statement embellished with graphic descriptions of how policemen are sexually abused in jail. The preceding is the version of the events of November 22, 1985, relevant to determining whether Curry is entitled to qualified immunity.

## II

■ Qualified immunity is a threshold issue that the Supreme Court has repeatedly emphasized should be resolved at the earliest possible stage of litigation. *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523; *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411; *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396. "One of the purposes of the *Harlow* qualified immunity standard is to protect public officials from the 'broad ranging discovery' that can be 'peculiarly disruptive of effective govern-

---

Streets and by the Office of Professional Standards for allegedly forging checks made out to

his deceased mother.

ment.'" *Anderson,* 107 S.Ct. at 3042 n. 6 (quoting *Harlow,* 457 U.S. at 817, 102 S.Ct. at 2737). "*Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815. But both the defendant and the trial court in this case failed to acknowledge that the "entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*[3]

Despite the clear benefits to the defendant of asserting qualified immunity at the earliest possible stage in the litigation, Curry failed to raise the issue in his motion to strike and dismiss and neglected to file a summary judgment motion. He raised the issue for the first time on the eve of trial in his answer to the complaint[4] and at that time merely stated: "Defendants Cleary[5] and Curry are immune from liability in that their conduct, if any, was objectively reasonable and/or in good faith." Although this statement raises the issue, it cites no authority, contains no arguments and suggests the wrong legal standard for immunity—good faith. Thus an immunity doctrine designed to preclude unnecessary trials was not even argued prior to trial.

Defendant Curry did argue qualified immunity very briefly, in five sentences with citation to, but without discussion of, two cases from this Court, in his oral motion for a directed verdict at the close of the plaintiff's case. The district court denied the motion at that time. The trial contin-

ued and at the close of all the evidence, defendant renewed his motion for a directed verdict and the district court denied it again. Then during the conference on jury instructions, counsel for the defendant offered five instructions on qualified immunity and, over plaintiff's objections, the trial court allowed them. The salient instruction told the jurors that the "defendants are immune from liability if their conduct or conduct such as theirs had not been previously found to be unlawful, or if their conduct violated no clearly established statutory or Constitutional right." They were further guided by the same instruction that "[i]n making this determination, you must consider the status of the law on the date or dates in question before you."

■ How was the jury supposed to determine the law on the dates in question? And, if the jury somehow could determine the law on the dates in question, how was it supposed to determine if that law was "clearly established"? As plaintiff's counsel asked, "How is the jury ever going to know that?" The trial court had "no problem" with the above instruction. We do. The question of qualified immunity is a question of law for the court, not for the jury. *Rakovich,* 850 F.2d at 1201–1202; *Benson v. Allphin,* 786 F.2d 268, 274 (7th Cir.1986), certiorari denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109; *Llaguno v. Mingey,* 763 F.2d 1560, 1569 (7th Cir.1985) (*en banc*); *Joseph v. Brierton,* 739 F.2d 1244, 1249 (7th Cir.1984). *Cf. Rakovich,* 850 F.2d 1179 n. 15.

■ Curry may not, of course, challenge this jury instruction because he did not

---

3. Although the benefit of immunity from suit is effectively lost once the parties go to trial, we allow plaintiffs to use "qualified immunity" as a defense to liability at any stage in the litigation. See, *e.g., Rakovich v. Wade,* 850 F.2d 1180, 1204 (7th Cir.1988) (*en banc*) (qualified immunity raised in motion for directed verdict at close of plaintiff's case and, when denied, sent to the jury); *Benson v. Allphin,* 786 F.2d 268, 272 (7th Cir.1986), certiorari denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (qualified immunity first raised in motion for summary judgment, then, when denied, raised in motion for directed verdict, then, when denied again, offered, and properly rejected, as jury instruction); *Crowder*

*v. Lash,* 687 F.2d 996, 1002–1004 (7th Cir.1982) (qualified immunity found in motion for directed verdict).

4. The answer was filed on December 15, 1986, and docketed on December 17, 1986. The trial began on December 16, 1986.

5. The jury assessed $1,000 compensatory damages against Cleary which the district court subsequently reversed by entering a judgment n.o.v. The decision for Cleary is not at issue in this appeal.

object at trial—he offered it. Fed.R.Civ.P. 51. See *Rakovich,* 850 F.2d at 1202; *McKinley v. Trattles,* 732 F.2d 1320, 1324 (7th Cir.1984). However, Curry raised the issue of qualified immunity in his motion for a directed verdict as well. Because we hold that he should have been found immune at that stage of the proceedings, there is no need to address the effect of the jury's decision. See *Rakovich,* 850 F.2d 1203–1204.

### III

The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Anderson,* 107 S.Ct. at 3042 (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139). Therefore, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Thus whether Curry is protected by qualified immunity turns on the objective reasonableness of his actions in those thirty minutes, as assessed in light of the legal rules that were "clearly established" on November 22, 1985.

The practical application of this standard depends substantially upon the level of generality at which the relevant legal rule is to be identified. For example, Alvarado claims that Curry violated his rights to due process, and in the broadest sense those rights are "clearly established" under the Due Process Clause. Under such a broad definition, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability. *Anderson,* 107 S.Ct. at 3039. At the other extreme Curry could counter that no court had "clearly established" that a thirty-minute confrontation by two police officers in

an eight by ten-foot room with the threat of indictment and humiliation constitutes coercion in violation of the Due Process Clause. Under such a narrow definition, defendants would be able to convert the rule of qualified immunity into a rule of absolute immunity. To avoid either extreme, the Supreme Court recently defined "clearly established" as follows:

> our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of the preexisting law the unlawfulness must be apparent.

*Anderson,* 107 S.Ct. at 3039.[6]

■ As the plaintiff, Alvarado bears the burden of demonstrating the existence of the allegedly "clearly established" constitutional right, *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3021, 82 L.Ed.2d 139; *Rakovich,* 850 F.2d at 1209; *Abel v. Miller,* 824 F.2d 1522, 1534 (7th Cir.1987), and he does not meet that burden. He cites only two cases, *Boyd v. Adams,* 513 F.2d 83 (7th Cir.1975), and *Murphy v. Rockford,* 55 Ill. App.3d 695, 13 Ill.Dec. 543, 371 N.E.2d 260 (1st Dist.1977). Neither meets the standard set forth in *Anderson.*

*Murphy* is totally inapposite. The plaintiff, a former police lieutenant, signed a release waiving all rights to his salary for a period prior to his resignation when he was on suspension and waiving all claims arising from his resignation. The plaintiff did not allege that his resignation was coerced or that the release was coerced. He merely alleged that the release was invalid for lack of consideration. The court's analysis, therefore, was based on Illinois contract

---

**6.** Although *Anderson* was decided after Alvarado's resignation and after the trial in this case, it did not establish a new principle of law; it merely developed the requirements of qualified

immunity under *Harlow.* Accordingly, we have held that it applies retroactively. *Rakovich,* 850 F.2d at 1208 n. 20.

law, not the Due Process Clause. *Murphy*, 55 Ill.App.3d at 699, 13 Ill.Dec. at 546–547, 371 N.E.2d at 263–264.

*Boyd*, however, is relevant. It addressed the validity of an agreement, signed by a pregnant woman (who later miscarried, allegedly due to police mistreatment of her), that released the police officers from civil liability in exchange for the dropping of all criminal charges against her. At the time she signed the release, the plaintiff was on conditional recognizance bail and her uncontested testimony was that she would not be able to pay the fines and therefore thought she would again be put in jail. We held that under the age-old concept of duress by imprisonment, the plaintiff was effectively restrained and the release, therefore, was coerced. *Boyd*, 513 F.2d at 88.

Although *Boyd* might be useful in determining what constitutes coercion, it does not satisfy the standard required by *Anderson*. *Anderson* does not require that the very action in question has been held to constitute coercion, but it does require that preexisting law make the unlawfulness of the conduct apparent. *Anderson*, 107 S.Ct. at 3039. The plaintiff in *Boyd* was a civilian who had been arrested and held in jail and feared she would be put back there. Alvarado was a police officer who was neither arrested nor indicted. He was under the threat of indictment, but knew that an indictment was not imminent, because only a prosecutor, not Curry, had the power to indict him. Because of the factual distinctions between the situations of the plaintiff in *Boyd* and Alvarado, *Boyd* is insufficient to clearly establish Curry's conduct as unconstitutional.

Defendant argues that plaintiff is unable to clearly establish that Curry's con-

duct was in violation of the Fourteenth Amendment because his conduct was in fact constitutional. Defendant cites *Christie v. United States*, 518 F.2d 584, 207 Ct.Cl. 333 (1975), for the proposition that employee resignations are presumed to be voluntary and that the standard for coercion is not easily satisfied. The court in *Christie* held the plaintiff's resignation voluntary because, "plaintiff *had a choice*. She could stand pat and fight. She chose not to. Merely because plaintiff was faced with an inherently unpleasant situation in that her choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of her resignation." *Id.* 518 F.2d at 587–588. Defendant also cites *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir.1982), certiorari denied, *sub nom. Dusanek v. O'Donnell*, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (choice between defending oneself in proper dismissal hearing or accepting change in job status does not constitute coercion), and *People v. Board of Education of Morton High Schools*, 606 F.Supp. 385, 390 (N.D.Ill.1985) (choice between two unpleasant alternatives, resignation or discharge, not coercive unless employee can show that employer believed that the proposed basis for discharge was unfounded).[7] Because Alvarado could have chosen to stand pat and fight, these cases support the conclusion that his resignation was not coerced.

Defendant also cites some authority establishing that individual actions allegedly taken or threatened by Curry were themselves constitutional.[8] *Confederation of Police v. City of Chicago*, 547 F.2d 375, 376 (7th Cir.1977), certiorari denied, 431 U.S. 915, 97 S.Ct. 2175, 53 L.Ed.2d 224 (Chicago police officer has no property interest in a particular assignment or duty); *Division 241 Amalgamated Transit Un-*

---

7. Defendant also cites *Dumas v. Merit Systems Protection Board*, 789 F.2d 892 (Fed.Cir.1986), for this proposition. However, this case, decided in 1986, is irrelevant to the state of the law at the time the incident occurred, November 1985.

8. Again, defendant relied on, and appended to his brief, a case that is inapplicable because it was decided after the relevant date, November

22, 1985. *Shamley v. City of Chicago*, 163 Ill. App.3d 375, 114 Ill.Dec. 491, 516 N.E.2d 646 (1st Dist.1987) (Chicago Police Department may require police officers to submit urine samples and officers may be reassigned to the radio room and deprived of their authority to make arrests and carry firearms).

*ion v. Suscy,* 538 F.2d 1264 (7th Cir.1976), certiorari denied, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (state had the right to request urine specimens from bus drivers in certain circumstances [9] ); *Van Alstine v. McAldon,* 141 Ill.App. 27, 31 (1st Dist.1908) (a resignation made under threat of indictment is not coerced where no warrant has been issued or criminal proceedings commenced). Although the constitutionality of these individual actions does not clearly establish that in combination they cannot constitute coercion, it effectively counters any assertion that the law clearly established the opposite, that in combination such actions were unconstitutional.

For the reasons stated above, we hold that Lieutenant Curry was entitled to qualified immunity for the action he took against Alvarado in the performance of his duty as commanding officer of the Corrupt Practices Unit.

### IV

Defendant also appeals the award of $32,962.08 in attorneys' fees pursuant to 42 U.S.C. § 1988. Section 1988 allows the award of attorneys' fees to a prevailing party in an action pursuant to 42 U.S.C. § 1983. Because we hold Curry was immune from suit, Alvarado is no longer a prevailing party. Accordingly, the award of attorneys' fees is vacated.

REVERSED.

---

**9.** The evidence is controverted on this point. While Curry said that he wanted a urine specimen from Alvarado for a drug screen, the latter testified that no such request was made (defendant's br. 9, 10).