Larry NOLAND, Plaintiff,

v.

William WHEATLEY, et al., Defendants.

No. 3:93–CV–55RM.

United States District Court,
N.D. Indiana,
South Bend Division.

Oct. 22, 1993.

John W. Emry, Jr., Franklin, IN, for plaintiff.

Caren L. Pollack, Michael R. Morow, James S. Stephenson, Indianapolis, IN, for defendants.

*MEMORANDUM AND ORDER*

MILLER, District Judge.

This cause comes before the court on the motion of defendants William Wheatley, Sheriff of Wabash County, Edie Gidley, Sandy Nelson, Kevin Farr, and the Board of Commissioners of Wabash County to dismiss or, in the alternative, for qualified immunity. The defendants seek dismissal of plaintiff Larry Noland's claims under the Rehabilitation Act of 1973, the Americans with Disabilities Act, 42 U.S.C. § 1983, and the Indiana Jail Standards.

For the reasons that follow, the court finds that the defendants' motion must be granted in part and denied in part.

I. *Standard of Review*

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of complaints that state no actionable claim. The complaint's factual allegations will be taken as true and viewed in the light most favorable to the plaintiff when challenged by a motion to dismiss.

*Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Dismissal is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## II. *Factual Background*

Mr. Noland is a semi-quadriplegic, and confined to a wheelchair as a result of suffering a broken neck more than nineteen years before his incarceration in the Wabash County Jail (the "jail"). He has no use of his legs, limited use of his left hand, and approximately eighty percent of the use of his right hand. Mr. Noland has no bladder; he must use both a colostomy and urostomy bag to remove body waste. Mr. Noland requires soap and water to clean his hands when he cleans or changes the bags. He requires several medications daily. Failure to maintain daily medications, to care for any body sores, or to keep Mr. Noland clean was a known danger to his health and life.

On September 17, 1991, Mr. Noland was arrested and placed in the jail. On the initiative of the Wabash County Sheriff's Department, Mr. Noland was moved a short time later to a nursing home because of his disability. The defendants were aware, or should have been aware, of Mr. Noland's condition and needs.

On February 19, 1992, Mr. Noland again was arrested and incarcerated in the jail. He had recently received a skin graft for an old sore on his buttocks that had healed. Upon incarceration, Mr. Noland had no pressure sores or other such problems. During his stay in the jail, Mr. Noland developed four separate pressure sores, which were not only quite painful, but dangerous to his health. Mr. Noland also had severe renal problems aggravated by the lack of adequate access to water and medical treatment.

At Sheriff Wheatley's direction, Mr. Noland was placed in the jail's padded cell rather than being transferred to a nursing home or hospital. The padded cell had no bed or other furniture, no running water, and only an open drain in the floor for disposal of bodily waste. The padded cell had poor ventilation and temperature control. It was unclean and a stench emitted from the open drain in the floor. While in the padded cell, Mr. Noland was constantly on camera; thus, he had no privacy, even when bathing himself. Moreover, the door to the padded cell was nearly always locked, unlike other jail areas. Housing in the padded cell generally is limited to emergency situations and then for only twenty-four hours at a time; Mr. Noland spent three months in the padded cell. The defendants were well aware of the intended limited use of the padded cell.

The jail had at least one cell with a bed and running water that might have accommodated Mr. Noland; yet, accepting the complaint's allegations as true, the defendants denied Mr. Noland use of that cell. The cells in the female unit were also suitable to Mr. Noland's needs. No attempt was made to accommodate Mr. Noland, even though Mr. Noland complained about his assignment to the padded cell to Sheriff Wheatley and to each jail officer who came into the cell or who passed by.

After two nights, Mr. Noland received a bed and a pitcher of water. Mr. Noland still had no means of washing his hands or cleaning either his colostomy or urostomy bags after emptying them. The pitcher was refilled once in a while with only warm water. Mr. Noland did not receive the quantity of water needed to keep his kidneys functioning. He complained to both Sheriff Wheatley and Ms. Gidley about his lack of sufficient water, but to no avail.

Even after a physician prescribed more water to keep Mr. Noland's system functioning properly, the defendants denied him a sufficient quantity of water. Ms. Nelson refused to bring Mr. Noland water when he requested it. The physician prescribed sixty-four ounces of water for Mr. Noland per shift, but Mr. Noland often received less than eight ounces each day.

Initially, Mr. Noland was not allowed to shower as other inmates were, but could only sponge bathe himself every other day. After three months, Mr. Noland was given access to a shower, but he had to sit on the dirty

floor despite his open pressure sores and an infected ankle sore. His showering time was limited to thirty minutes despite his difficulties in washing himself with only one arm. Mr. Noland had to dress and undress on the shower floor.

According to the complaint, Mr. Noland consistently was denied the medical treatment he required. Ms. Nelson and Ms. Gidley would deny Mr. Noland his medication or give it to him late. No one in the jail was trained to handle Mr. Noland's medications; Sheriff Wheatley refused to employ a licensed nurse to care for Mr. Noland's medical needs. Rather, a female inmate, Hazel Sigsby, looked after Mr. Noland, though irregularly. Mr. Noland asked Sheriff Wheatley for a practicing nurse to care for his sores and other needs, to no avail.

When Mr. Noland spilled or got material from one of his bags on his hands, he often had to wait as long as twenty-four hours to wash it off. As a result, he had to eat many meals with the human waste still on his hands.

Mr. Noland was moved to a regular cell on May 6, 1992, but could not sleep in the bed provided because his wheelchair did not fit through the door to the bed. Mr. Noland still lacked access to water and a bathroom, and had very little room in his cell to maneuver his wheelchair.

Mr. Noland's wheelchair once had a flat tire. When approached, Mr. Farr forced Mr. Noland to get out of the wheelchair and crawl back to his cell to have the tire repaired. On another occasion, Mr. Farr refused to allow Mr. Noland to wash his hands although Mr. Noland had feces on his hands, explaining that it was not Mr. Noland's bath day. Mr. Noland had to wait until his bath day to wash the feces off his hands.

Shortly after his incarceration, the defendants forced Mr. Noland to sit in his wheelchair for nearly thirteen hours despite having been advised that two hours was the prescribed limit that Mr. Noland could sit in his wheelchair. Although Mr. Noland asked to be moved several times, he was told to wait. Pressure on a paralyzed individual's skin for more than two hours is a common cause of pressure sores. As a result, Mr. Noland's new skin graft was destroyed and his pressure sore reopened.

Finally, the defendants denied Mr. Noland recreation, access to the law library, and other programs and services because of his disability. Other inmates with disabilities were provided these programs and services.

### III. *Discussion*

#### A. *Rehabilitation Act of 1973 Claims*

■ Mr. Noland has failed to state a claim under the Rehabilitation Act of 1973 ("the Act"). The Act provides in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). To state a claim under the Act, a plaintiff must allege the following material elements:

> (1) the plaintiff is a "handicapped person" under the Act; (2) the plaintiff is "otherwise qualified" for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and, (4) the relevant program or activity is receiving federal financial assistance.

*Landefeld v. Marion General Hosp., Inc.,* 994 F.2d 1178, 1180–81 (6th Cir.1993) (citations omitted).

Because Mr. Noland has failed to allege in his complaint that the relevant program or activity receives federal financial assistance, the court must dismiss his claims under the Act. However, in the interest of deciding claims on their merits, the court will afford Mr. Noland fifteen days following the entry of this order in which to file an amended complaint with respect to the claims under the Act.

## B. Americans with Disabilities Act Claims

■ Mr. Noland has stated a claim of discrimination based on his handicap under the Americans with Disabilities Act ("ADA"). ADA Sections 12131 through 12134, 42 U.S.C. § 12131–12134, prohibit discrimination in public services, and are the relevant sections governing Mr. Noland's claims. The ADA, 42 U.S.C. § 12101 *et seq.,* provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. 42 U.S.C. § 12131(1) defines "public entity" to include any state or local government or any department, agency, special purpose district, or other instrumentality of a State or States or local government. 42 U.S.C. § 12131(1)(A) and (B). Congress enacted the ADA on July 26, 1990, and provided:

> (a) General Rule. Except as provided in subsection (b), this subtitle [42 U.S.C. § 12131–12133 and this note] shall become effective 18 months after the date of enactment of this Act [the ADA].
> (b) Exception. Section 204 [42 U.S.C. § 12134] shall become effective on the date of enactment of this Act [the ADA].

Pub.L. No. 101–336, Title II, § 205, 104 Stat. 337 (1990). Hence, contrary to the defendants' assertion, the ADA became effective on January 26, 1992, and was in effect during Mr. Noland's second incarceration in the Wabash County Jail.[1]

■ The defendants cite *Kent v. Director, Mo. Dept. of Elem. and Sec. Educ. and Div. of Vocational Rehabilitation,* 792 F.Supp. 59, 61–62 (E.D.Mo.1992), as authority for the proposition that a plaintiff cannot bring suit under the ADA before receiving a right to sue letter as required by 42 U.S.C. § 2000e–

5(f)(1). The *Kent* court looked to the enforcement provision of 42 U.S.C. § 12117(a) in determining that the procedures of § 2000e–5 are applicable to an ADA proceeding.[2] 792 F.Supp. at 62. Because the plaintiff in *Kent* complained of employment discrimination, the court looked to the enforcement provision governing the title of the ADA that covers employment discrimination, 42 U.S.C. § 12117(a).

*Kent* does not apply to this cause. Mr. Noland's allegations involve an entirely different title of the ADA (Title II—Public Services) and are governed by an entirely different enforcement provision—42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.").

■ The defendants further contend that Mr. Noland must file an administrative claim with the Equal Employment Opportunity Commission before bringing his ADA claims in this court. The court disagrees. Claims under Title II of the ADA do not require exhaustion of administrative remedies. *See Smith v. Barton,* 914 F.2d 1330, 1338 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991); *Greater Los Angeles Council on Deafness, Inc. v. Community Television of So. Cal.,* 719 F.2d 1017 (9th Cir.1983), *cert. denied sub nom., Gottfried v. United States,* 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *Miener v. State of Mo.,* 673 F.2d 969, 973–75 (8th Cir.), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *Petersen v. Univ. of Wisconsin Bd. of Regents,* 818 F.Supp. 1276 (W.D.Wis.1993) (state employee did not have to exhaust administrative remedies before bringing claim under Title II of the ADA); *Finley v. Giacobbe,* 827 F.Supp. 215, 219 n. 3 (S.D.N.Y.1993).

---

1. Mr. Noland's first incarceration occurred before the ADA was in effect, but the complaint alleges conduct that occurred when he was incarcerated the second time on February 19, 1992—after the ADA was in effect.

2. 42 U.S.C. § 12117(a) provides in pertinent part: "The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures *this subchapter* provides." (Emphasis added.)

■ The language of the relevant enforcement provision, § 12133, admittedly is ambiguous. In referring to § 794a, § 12133 fails to distinguish between § 794a(a)(1) and § 794a(a)(2), each of which incorporates different rights, remedies, and procedures. 29 U.S.C. § 794a provides:

(1) The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e–5(f) through (k)), shall be available, with respect to any complaint under section 791 of this title....

(2) The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C.A. § 2000d *et seq.*) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

In light of this ambiguity, the regulations promulgated by the Department of Justice interpreting Title II of the ADA are entitled to controlling weight. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *United States v. 25 Cases, More or Less, of an Article of Device,* 942 F.2d 1179, 1182 (7th Cir.1991). Section 12134 gave the Attorney General one year from the date of enactment to promulgate regulations implementing Title II of the ADA. The regulations were promulgated and effective on July 26, 1991. *See* 28 C.F.R. § 35.101 *et seq.* (1993).

The regulations specifically provide that although federal agencies are available to hear claims under the ADA, plaintiffs are not required to file with the agencies prior to filing in federal court. 28 C.F.R. §§ 35.170–178 (1993). The Department of Justice's analysis of the regulations regarding complaints under the ADA provides:

The [ADA] requires the Department of Justice to establish administrative procedures for resolution of complaints, but does not require complainants to exhaust these administrative remedies. The Committee Reports make clear that Congress intend-ed to provide a private right of action with the full panoply of remedies for individual victims of discrimination. Because the [ADA] does not require exhaustion of administrative remedies, the complainant may elect to proceed with a private suit at any time.

App. A to 28 C.F.R. § 35.172 (1993). *See also Petersen v. Univ. of Wisconsin Bd. of Regents,* 818 F.Supp. at 1279–80; 28 C.F.R. § 35.172(b) (1993); *Title II Technical Assistance Manual,* United States Dept. of Justice, Civil Rights Division, Office on the Americans with Disabilities Act, at 48 ("The ADA does not require complainants to exhaust administrative remedies prior to instituting litigation.").

Accordingly, because the ADA was in effect during the period of Mr. Noland's incarceration, and because Mr. Noland need not exhaust any administrative remedies that may be available to him, the court denies the defendants' motion to dismiss Mr. Noland's claims under the ADA.

### C. Section 1983 Claims

■ 42 U.S.C. § 1983 provides a remedy for constitutional violations and violations of federal statutes, where the violations are under color of state law, 42 U.S.C. § 1983; *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), but is not available to enforce a federal statute " 'where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983.' " *Suter v. Artist M.,* —— U.S. ——, ——, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992) (quoting *Wright v. City of Roanoke Redevelopment & Housing Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)); *see also Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The Supreme Court has developed a three-part test to determine whether a statute creates an enforceable right:

We have asked (1) whether the statutory provision at issue " 'was intend[ed] to benefit the putative plaintiff.' " ... If so, then the provision creates an enforceable right

unless (2) the provision "reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit," . . ., or unless (3) the plaintiff's interest is so " 'vague and amorphous' " as to be " 'beyond the competence of the judiciary to enforce.' "

*Suter v. Artist M.,* — U.S. at ——, 112 S.Ct. at 1371 (citations omitted). The court must make two inquiries[3] to determine whether Mr. Noland may premise a § 1983 claim upon his ADA claims: (1) whether Congress foreclosed enforcement of the ADA within the statute itself; and (2) whether the ADA creates enforceable rights, privileges, or immunities within the meaning of § 1983.

■■■ The ADA satisfies the first inquiry. Congress intends to foreclose enforcement of a statute when the statute itself provides a comprehensive remedial scheme demonstrating congressional intent to preclude remedies under § 1983, *see Suter v. Artist M.,* — U.S. at —— n. 11, 112 S.Ct. at 1368 n. 11; *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 520–21, 110 S.Ct. 2510, 2523, 110 L.Ed.2d 455; *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n.,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981), or where the statute has an express provision precluding enforcement through § 1983. *Wilder v. Virginia Hosp. Ass'n.,* 496 U.S. at 520–21, 110 S.Ct. at 2523. As previously discussed, enforcement of the ADA is not limited to the available administrative remedies and procedures; rather, complainants have a private right of action and may elect to proceed with a civil suit at any time. *See Petersen v. Univ. of Wisconsin Bd. of Regents,* 818 F.Supp. at 1279–80; 28 C.F.R. § 35.172(b) (1993); App. A to 28 C.F.R. § 35.172 (1993).

■■■ The ADA satisfies the second inquiry because it creates enforceable rights for individuals with disabilities. First, the ADA was intended to benefit individuals with physical or mental disabilities by eliminating discrimination against them because of their disabilities. 42 U.S.C. § 12101(a) and (b). Mr. Noland is an individual with a disability; thus, the ADA was intended to benefit him.

■■■ Second, the requirements of the ADA are more than mere preferences; they are mandates enforceable by law. 42 U.S.C. § 12101 *et seq.* In determining whether a statute reflects a "congressional preference" or imposes "binding mandates", the Supreme Court has emphasized two factors. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. at 512, 110 S.Ct. at 2518; *Suter v. Artist M.,* — U.S. at ——, 112 S.Ct. at 1372 (Blackmun, J., dissenting). The first factor is whether the statute is "cast in mandatory rather than precatory terms." The second factor is whether any federal benefit is expressly conditioned upon compliance with the statute. *Id.* The ADA uses such mandatory language as "shall". *See* 42 U.S.C. § 12132 ("no qualified individual with a disability *shall* . . . be excluded from participation in or be denied the benefits"). Additionally, entities that violate the ADA stand to lose federal assistance. App. A to 28 C.F.R. § 35.164 (1993). The Department of Justice's analysis of the regulations regarding violations of the ADA provides in relevant part:

> [The ADA] is enforced by the Federal agencies that provide the Federal financial assistance to the covered programs and activities in question. If voluntary compliance cannot be achieved, Federal agencies enforce [the ADA] either by termination of Federal funds to a program that is found to discriminate . . . or by a referral to this Department [of Justice] for judicial enforcement.

App. A to 28 C.F.R. § 35.164 (1993).

■■■ Third, Mr. Noland's interest created by the ADA is not so vague and amorphous so as to be incomprehensible. The ADA gives disabled individuals specific rights enforceable by very comprehensive administrative procedures, as well as providing the right to file civil suit in federal court. 42 U.S.C. § 12133; 28 C.F.R. §§ 35.170–178

---

**3.** The defendants do not appear to argue that Congress provided a comprehensive enforcement scheme that evidences an intent to foreclose private enforcement of the ADA under § 1983. *See*

*Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981).

(1993). The ADA's use of the term "reasonable" in 42 U.S.C. § 12131(2) to describe the required modifications of programs or services does not render Mr. Noland's interest, and that of all other disabled individuals, "vague and amorphous". *See Suter v. Artist M.,* —— U.S. at —— – ——, 112 S.Ct. at 1372–74 (Blackmun, J., dissenting); *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. at 520, 110 S.Ct. at 2523 (holding the Boren Amendment created rights enforceable under § 1983 by requiring the adoption of "reasonable and adequate" Medicaid reimbursement rates); *Wright v. City of Roanoke Redevelopment & Housing Auth.,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (holding that the provision for a "reasonable" allowance for utilities in regulation was not so vague and amorphous and tenants had an enforceable right under § 1983). Federal courts routinely enforce reasonableness clauses in federal statutes. *See, e.g., Virginian Ry. Co. v. System Fed'n No. 40,* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) (enforcing "every reasonable effort" clause of the Railway Labor Act and noting "whether action taken or omitted is . . . reasonable is an everyday inquiry by federal courts").

Accordingly, the court denies the defendants' motion to dismiss Mr. Noland's § 1983 claims premised upon the ADA. However, because Mr. Noland has failed to state a claim under the Rehabilitation Act of 1973, as discussed above, the court grants the defendants' motion to dismiss Mr. Noland's § 1983 claims premised upon the Rehabilitation Act of 1973.

### D. Violations of Indiana Jail Standards

The defendants argue that Mr. Noland's claims under the Jail Standards should be dismissed. The court must first identify the precise constitutional protection upon which Mr. Noland bases his claims under the Jail Standards. Mr. Noland alleges that the jail conditions and the defendants' actions deprived him of his liberty interests without due process of law, and that he was punished without due process of law. Mr. Noland seeks to recover under a procedural due process theory.

■ A two-step process governs analysis of procedural due process claims. First, an individual claiming a due process violation must establish that he has a protectable liberty interest, *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989); *Colon v. Schneider,* 899 F.2d 660, 666 (7th Cir.1990), which arises either from the Due Process Clause of the Fourteenth Amendment or from state law. *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. at 460, 109 S.Ct. at 1908; *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). Second, if the court determines the individual has a protectable liberty interest, it must determine what procedural safeguards are required to protect that interest. *Williams v. Lane,* 851 F.2d 867, 880 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989); *see also Vitek v. Jones,* 445 U.S. 480, 488–89, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980); *Culbert v. Young,* 834 F.2d 624, 628 (7th Cir.1987), *cert. denied,* 485 U.S. 990, 108 S.Ct. 1296, 99 L.Ed.2d 506 (1988).

Mr. Noland contends that certain state regulations concerning county jails vest him with property interests protected by the Due Process Clause, noting the use of mandatory language of the sort discussed in *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506. The defendants argue that mandatory language is insufficient to establish a property interest, citing *Colon v. Schneider,* 899 F.2d 660. The parties address the regulations as a group, but the court believes that each regulation must be given its own analysis.

■ Regulations found at 120 I.A.C. 3–1–7 require that each county jail "shall provide" cells with direct access to a toilet, a washbasin with running water, and a bunk, 210 I.A.C. 3–1–7(a)(4), at least one toilet and one shower for every twelve inmates, 210 I.A.C. 3–1–7(a)(5), an area suitable for inmates under special medical supervision, 210 I.A.C. 3–1–7(e), an area for inmates requiring special supervision based on intoxication or self-destructive behavior, which must be equipped with audio-visual equipment and have access to a toilet and running water, 210 I.A.C. 3–1–

7(f), and one bed for each inmate, 210 I.A.C. 3–1–7(g). State regulations also require that each jail "shall be maintained in a safe and sanitary condition, in compliance with state and local health, sanitation, safety, and fire laws", 210 I.A.C. 3–1–9(a), that state licensing and certification requirements and restrictions shall apply to all health care personnel working with jail inmates, 210 I.A.C. 3–1–11(c), and that jail officials must use their best efforts to obtain any prescription medicines and may not substitute medications without the prescribing physician's approval, 210 I.A.C. 3–1–11(k).

Each of these regulations uses language of the mandatory nature required by *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506, but the Seventh Circuit has explained that the simple use of "shall" or "must", while perhaps necessary to create a property interest, is not sufficient alone. In *Colon v. Schneider,* 899 F.2d 660, the court considered a Wisconsin regulation concerning the use of mace on inmates; the plaintiff based his asserted property interest on that regulation's mandatory language. The *Colon* court determined that the real issue was not whether Colon was maced without due process of law, but whether he was maced in violation of the Wisconsin regulations. 899 F.2d at 671. The court concluded that Colon advanced a substantive, not a procedural, due process claim. *Id.*

As in *Colon,* the regulations outlined above do not vest county jail inmates with constitutionally cognizable property interests. To require county jails to maintain one shower for every twelve inmates does not, for example, provide an inmate with a right to a second shower upon the jail's admission of a thirteenth inmate, and application of otherwise applicable state safety codes to county jails creates no more of a property interest than the safety codes provide to the general public. As *Colon* demonstrates, not all regulations binding upon an official create a property interest. 210 I.A.C. 3–1–6(a)(21) uses equally mandatory language in requiring county jails to note tatoos on an intake form, but creates no property right on the part of tatooed inmates. Because the regulations discussed above create no property right, the plaintiff's due process claims based on those regulations must be dismissed.

Other regulations cited by the plaintiff, however, cannot be so easily resolved. Unlike the regulations concerning the jail's physical plant and codes covering it, these regulations speak of rights of inmates:

- 210 I.A.C. 3–1–15(a) provides that "[j]ail inmates not represented by counsel shall have reasonable access to an adequate law library."

- 210 I.A.C. 3–1–15(c) provides that "[i]nmates shall have the right of access to reading material" other than pornography and items deemed by jail officials to pose a security threat.

- 210 I.A.C. 3–1–15(e) provides that inmates "shall be given a reasonable opportunity for physical exercise and recreation outside of his immediate living quarters and out of doors where feasible, consistent with the security and resources of the jail."

- 210 I.A.C. 3–1–10(c) provides that "[i]nmates ... shall be afforded the opportunity to shower at least three times a week [after admission to the general population] unless an emergency or a threat to jail security exists."

- 210 I.A.C. 3–1–15(h) provides that "[a]ll inmates shall have the right to file written grievances regarding treatment of conditions in the jail" with designated officials pursuant to a written procedure the sheriff "shall" establish and make known to inmates, and that grievances "shall be promptly investigated" with a written disposition provided to the inmate.

- 210 I.A.C. 3–1–17 governs disciplinary actions. It requires that "[t]he disciplinary action imposed shall be proportionate to the seriousness of the violation." 210 I.A.C. 3–1–17(a). The regulations limit the available discipline, and include reference to loss or limitation of privileges, 210 I.A.C. 3–1–17(c)(3), and segregation from the general population, 210 I.A.C. 3–1–17(c)(7).

For varying reasons, the court concludes that these regulations do not create constitutionally cognizable property or liberty interests:

A. The regulation concerning grievance procedures, 210 I.A.C. 3–1–15(h), does nothing more than to require the establishment of a procedure. In a case of this sort, a procedural due process claim must be based on the denial of constitutionally-defined procedural protections with respect to deprivation of a state-created property or liberty interest; a claim of denial of a state-created procedure does not state a federal constitutional claim. *See, e.g., Maust v. Headley,* 959 F.2d 644, 648 (7th Cir.1992) ("the law is well-settled that state-created procedural rights do not, standing alone, constitute protected liberty interests.").

B. Others of the regulations use the mandatory "shall", but provide such broad grants of uncanalized discretion as to fall short of creating a legitimate claim of entitlement. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. at 462–463, 109 S.Ct. at 1909–10. As in *DeTomaso v. McGinnis,* 970 F.2d 211, 213 (7th Cir.1992), "Prison officials must choose, and no rule governs the exercise of their discretion. Freedom to choose—with nary a clue about how that discretion must be exercised—means that the rules create neither liberty nor property." 210 I.A.C. 3–1–15(e) appears to provide inmates with the opportunity for exercise and recreation, but that right is subject to limitation "consistent with the security and resources of the jail." 210 I.A.C. 3–1–10(c) appears to provide the right to three weekly showers, and 210 I.A.C. 3–1–15(c) appears to provide a right of access to reading material, but each of those rights may be curtailed if jail officials deem a "threat to jail security" to exist; the regulations define neither "threat" nor "jail security". Finally, 210 I.A.C. 3–1–15(a) guarantees only a right of "reasonable" access to a law library; no word grants a broader range of discretion than "reasonable".

Accordingly, the complaint states no federal claim upon which relief can be granted based on 210 I.A.C. 3–1–15(e), 210 I.A.C. 3–1–10(c), or 210 I.A.C. 3–1–15(a).

C. Finally, 210 I.A.C. 3–1–17, which governs disciplinary actions, supports no claim under the facts alleged in the complaint. There is no allegation that Mr. Noland was subjected to disciplinary proceedings. A rule that identifies conditions that may be imposed as punishment does not mean that punishment has been inflicted any time those conditions are present. *See Wallace v. Robinson,* 940 F.2d 243 (7th Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 1563, 118 L.Ed.2d 210 (1992).

Accordingly, the defendants' motion to dismiss the due process claims based on the Indiana Jail Standards must be granted.

### E. Qualified Immunity

The court need address only whether the qualified immunity defense is available against the ADA claims, since Mr. Noland has failed to state a claim under the Rehabilitation Act of 1973 and the Indiana Jail Standards. For the reasons following, the court determines that qualified immunity is unavailable to the defendants as against the ADA claims.

The qualified immunity defense recognized in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), is an affirmative defense against insubstantial claims. The defense involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975), *quoted in, Harlow v. Fitzgerald,* 457 U.S. at 815, 102 S.Ct. at 2736. The defense of qualified immunity is unavailable where an official:

> knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or if he* took the action with the malicious intention to cause a deprivation of constitutional rights or other injury.

*Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. at 1000, *quoted in, Harlow v. Fitzgerald,* 457 U.S. at 815, 102 S.Ct. at 2736. Although the *Wood* Court limited its holding to the special context of school discipline, subsequent cases have quoted *Wood* as a general statement of the qualified immunity standard. *Harlow v.*

**488**

*Fitzgerald,* 457 U.S. at 815 n. 25, 102 S.Ct. at 2736 n. 25.

■ Qualified immunity provides a defense to conduct which "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. To be "clearly established", a right must be "sufficiently particularized to put potential defendants on notice that their conduct is unlawful." *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.) (citations omitted), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent official should know the law governing his conduct." *Harlow v. Fitzgerald,* 457 U.S. at 818–19, 102 S.Ct. at 2738; *see also Abel v. Miller,* 824 F.2d 1522, 1530 (7th Cir.1987). Whether an official is protected under qualified immunity depends on the objective reasonableness of his actions. *Alvarado v. Picur,* 859 F.2d 448, 452 (7th Cir.1988); *Abel v. Miller,* 824 F.2d 1522 (7th Cir.1987).

■ The plaintiff bears the burden of showing that the "clearly established" right existed. *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984); *Alvarado v. Picur,* 859 F.2d at 448. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [I]n light of the preexisting law[,] the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), *quoted in, Alvarado v. Picur,* 859 F.2d at 452. The focus is whether the officials were on notice that their actions violated clearly established law. *Ellis v. Wynalda,* 999 F.2d 243 (7th Cir.1993); *Rakovich v. Wade,* 850 F.2d 1180, 1211 (7th Cir.1988).

■ The defendants claim entitlement to qualified immunity, contending that the ADA was not clearly established law during the time in which the conduct that Mr. Noland alleges occurred. To the contrary, it is difficult to understand how the right asserted by Mr. Noland could have been more clearly established. The ADA and regulations regarding the ADA put the defendants on notice that their failure to even attempt to accommodate Mr. Noland was unlawful. The ADA was enacted July 26, 1990; the ADA provisions relevant to this action went into effect on January 26, 1992. Pub.L. No. 101–336, Title II, § 205, 104 Stat. 337 (1990). Unlike claims of constitutional violations, the ADA eventually was accompanied by a set of explanatory regulations, which were promulgated and effective as of July 26, 1991. 42 U.S.C. § 12134. The ADA regulations also supplemented standards for accommodating individuals in wheelchairs, which were promulgated a decade earlier in 1982. App. to 36 C.F.R. § 1191 (1993).

An official might claim qualified immunity when he has violated the ADA if his actions could reasonably have been thought consistent with an individual's rights under the ADA. *See Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039. The defendants are presumed to know the law—in this case the ADA—governing their actions. *See Harlow v. Fitzgerald,* 457 U.S. at 818–19, 102 S.Ct. at 2738. It is simply incomprehensible to believe that any of the defendants could have reasonably believed their inaction was consistent with Mr. Noland's rights under the ADA—an Act with the specific purpose of eliminating discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1). The ADA is clear: no qualified disabled individual shall "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

The defendants were well aware of Mr. Noland's disability in 1992 because of his brief stay in 1991. In fact, Sheriff Wheatley recognized Mr. Noland's disability and special needs and transferred him to a nursing home in 1991. There can be no doubt that the defendants knew that Mr. Noland was an intended beneficiary of the ADA. Any reasonable person would have known that a complete lack of effort and outright refusal to accommodate Mr. Noland violated his rights under the ADA; the defendants were on notice that their conduct was unlawful.

Accordingly, the court denies the defendants' claim of qualified immunity against the ADA claims.

## IV. *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss (filed July 27, 1993) must be, and hereby is, GRANTED IN PART and DENIED IN PART as follows:

(1) the motion is GRANTED with respect to Mr. Noland's claims under:

(a) the Rehabilitation Act of 1973 (the "Act");

(b) 42 U.S.C. § 1983 claims premised upon the Act; and

(c) the Indiana Jail Standards;

(2) the motion is DENIED with respect to Mr. Noland's claims under:

(a) the American with Disabilities Act ("ADA"); and

(b) 42 U.S.C. § 1983 claims premised upon the ADA;

(3) the motion is DENIED with respect to the defendants' qualified immunity against the ADA claims and § 1983 claims premised upon the ADA.

At an ensuing pretrial conference, the parties should be prepared to inform the court why the ADA claims should proceed down the twin, but apparently parallel, paths of the ADA and § 1983. Mr. Noland is afforded fifteen (15) days from the date of this order to submit an amended complaint with respect to his claims under the Rehabilitation Act of 1973.

SO ORDERED.